924 A.2d 582 (2007)
393 N.J. Super. 476
STATE of New Jersey, Plaintiff-Respondent,
v.
Eddie DANIELS, Jr., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted March 6, 2007.
Decided May 31, 2007.
*584 Yvonne Smith Segars, Public Defender, for appellant (Abby P. Schwartz, Assistant Deputy Public Defender, of counsel and on the brief).
Stuart Rabner, Attorney General, for respondent (Charles Grinnell, Deputy Attorney General, of counsel and on the brief).
Before Judges WEISSBARD, GRAVES and LIHOTZ.
The opinion of the court was delivered by
WEISSBARD, J.A.D.
In this case, we resolve a question left open in State v. Dangerfield, 171 N.J. 446, 463-64, 795 A.2d 250 (2002), concerning the permissible scope of a search incident to an arrest for the petty disorderly persons offense of defiant trespass. We conclude that where an individual is to be taken into custody pursuant to a valid arrest, there are no limitations on the scope of a search of the arrestee's person.
Defendant, Eddie Daniels, Jr., appeals from his conviction and sentence stemming from a negotiated plea of guilty to third-degree possession of cocaine, N.J.S.A. 2C:35-10a(1), following a denial of his motion to suppress evidence. R. 3:5-7(d). As part of his plea agreement, the State agreed, at the time of sentencing, to dismiss a complaint charging the petty disorderly persons offense of defiant trespass, N.J.S.A. 2C:18-3b. On March 10, 2006, defendant was sentenced to two years probation, ordered to seek full-time employment once he was medically cleared to do *585 so, and to participate in substance abuse evaluation, testing, and counseling. Appropriate penalties and assessments were also imposed.
As permitted, defendant's guilty plea preserved his right to appeal the denial of his motion to suppress. R. 3:5-7. Thus, the sole argument on appeal is:
BECAUSE THE POLICE HAD NO LEGITIMATE BASIS FOR ARRESTING DEFENDANT NOR ANY REASON FOR THE RESULTING PAT-DOWN SEARCH OF HIS PERSON, AND THE SEARCH OF DEFENDANT WAS ILLEGAL, AND HENCE THE DENIAL OF THE MOTION TO SUPPRESS MUST BE REVERSED.

I
On May 15, 2005, Officers Bard and Coleman of the Long Branch Police Department were on patrol and assigned to the Community Response Unit (CRU). The CRU concentrates on narcotics and "quality of life" issues in the community. The officers were in plain clothes and driving in an unmarked police vehicle as they patrolled the Grand Court and Garfield Court Federal Housing Projects. Both projects have placards identifying the nature of the housing project and informing individuals that there is no trespassing. As a result of routinely patrolling these locations for over five years, the two officers knew almost everyone who lived in the projects, their families, and the people who visited the residents.
At approximately 4:00 p.m., Bard and Coleman saw defendant ride his bicycle out of the Garfield Court project and pass them as they were going in the opposite direction. Not recognizing defendant, the officers turned their unmarked car around and followed him for approximately a quarter of a mile, at which point they pulled abreast of him. Without activating any lights or siren, the officers rolled the window down, and asked defendant if he would stop so that they could talk. Defendant stopped and the officers exited their vehicle.
With the defendant still sitting on his bicycle, the officers requested and received his identification, which consisted solely of a piece of paper from the Saint Barnabas Healthcare Center that identified him as Eddie Daniels, of 71 Fourth Avenue, Long Branch. The officers then questioned defendant.
In response to a question regarding his purpose in the area, defendant replied that he was visiting his cousin. When asked the name of his cousin, defendant responded "Rance," but was unable to provide his cousin's last name, the apartment number of his cousin's purported residence, nor the location of the apartment in question. Defendant then asked for a lawyer. Officer Bard testified that he asked these questions in order "to ascertain if he ever lived in Garfield Court, or had a family member there, or was just visiting legitimately there for any purposes." In doing so, the officers were following police department procedures instituted to determine if an individual is legitimately on the posted Federal Housing Project property. Bard noted that defendant was nervous during the encounter, failing to make eye contact with the officers.
Defendant was placed under arrest for trespassing based upon his inability to answer the officer's questions about his purpose in the area. In accordance with police department procedures, and out of concern for their own safety, one of the officers "patted down" defendant prior to transporting him to police headquarters. During the pat down, the officer felt what he believed to be a knife in defendant's front pocket. The officer reached into the *586 pocket to retrieve the object, which turned out to be a lighter, but, as he pulled it out, he observed a translucent orange baggie, which the officer reasonably believed was crack cocaine. The record does not explain how the baggie was exposed to view.
A central issue before the motion court was the nature of the search  whether it was a search incident to arrest or a Terry[1] pat down for the safety of the arresting officers. Bard testified that he patted down defendant primarily for his safety. When asked to explain, the officer responded:
The first part was that he was verbally evasive. When we were asking him the questions where he was coming from, he was unable to go and articulate clearly to me or explain where he was coming from. When continuing [to ask] him further questions, he kept diluting his answers.
He was also nervous by physically not looking at me. He failed to make eye contact while talking to me and he just generally appeared nervous to me in addition to the area itself being a high crime, high drug area.
Bard indicated that as part of his Police Department's policy, the officers "typically pat down defendants prior to placing [them] in your patrol cars." In this case, defendant was going to be transported in the undercover vehicle, which did not contain a steel partition between the driver and the arrestee. In his report of the incident, Bard wrote that "[t]o ensure officer safety, we searched the subject incident to arrest." Bard explained that at first it was a pat down for safety and "that's when I found the object . . . I didn't want to give him the chance to grab the object . . . [s]o that's when I went through his pockets out on the street."
In denying defendant's motion, the judge found that the initial police encounter with defendant was a field inquiry. Finding that the officers knew the people who lived in and visited Garfield Court, which is a high-crime area, that trespassing is common for the purposes of buying and selling drugs, and because defendant was evasive in his responses and acting nervously, the judge concluded that the officer made a permissible inference that defendant was trespassing. Once the decision to arrest was made, the judge held that the officer was free to conduct a pat down for safety reasons.
In providing a factual basis for his guilty plea, defendant advised the court that on May 15, 2005, he was in Long Branch and was stopped by police as he was peddling his bicycle. Defendant admitted that when the police searched him, they found in his hip pocket a small quantity of cocaine which was for his personal use.

II
Defendant argues that the police unlawfully stopped him and, therefore, the fruits of the subsequent search of his person, which revealed the cocaine, should have been suppressed. Defendant's argument subsumes two issues: (1) whether the arresting officers had probable cause to arrest him for defiant trespass; and (2) whether the police were permitted to search him incident to that arrest.
The State contends that there are actually four issues presented by this appeal: Whether the officers: (1) properly conducted a field inquiry when they stopped defendant; (2) properly questioned defendant; (3) had probable cause to arrest defendant; and (4) lawfully searched defendant for their own safety and/or incident to the arrest. As with many such *587 street encounters leading to arrest and search, we find it appropriate to proceed through the multi-level analysis suggested by the State.
A. The Initial Stop
It is settled that "the police do not violate the Fourth Amendment by `merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering as evidence in a criminal prosecution his voluntary answers to such questions.'" State v. Davis, 104 N.J. 490, 497, 517 A.2d 859 (1986) (quoting Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 236 (1983)); see also State v. Diloreto, 180 N.J. 264, 275, 850 A.2d 1226 (2004). Such an approach is known as a field inquiry, which "is a limited form of police investigation that, except for impermissible reasons such as race, may be conducted `without grounds for suspicion.'" State v. Rodriguez, 172 N.J. 117, 126, 796 A.2d 857 (2002) (quoting State v. Maryland, 167 N.J. 471, 483, 771 A.2d 1220 (2001)).
A key distinction between a field inquiry and an investigative stop is whether, considering the totality of the circumstances, a reasonable person would feel that the police had encroached on his or her freedom to leave. Maryland, supra, 167 N.J. at 483, 771 A.2d 1220. For example, a mere request for identification does not escalate a field inquiry into an investigative stop, provided the officer asks questions which are not overbearing or harassing, in a conversational tone, or in a manner that is non-confrontational and non-accusatory. Rodriguez, supra, 172 N.J. at 126, 796 A.2d 857.
Here, defendant appears to have been approached by the officers and asked whether he would answer some questions. The record demonstrates that the police never demanded that defendant get off his bike, or attempted to restrict the defendant's movement in any way. Nor did the officers activate the siren on their unmarked police vehicle. The objective facts support a finding that defendant was free to leave at any time. There is nothing in the record to suggest that either officer engaged in a form of questioning or employed actions designed to harass, embarrass or humiliate defendant. Additionally, there is nothing in the record to suggest that the officers' actions were pretextual in nature or design. The judge's finding that this was initially a field inquiry is supported by the record. State v. Locurto, 157 N.J. 463, 470-71, 724 A.2d 234 (1999).
B. The Questioning of Defendant
The questioning of defendant was designed to ascertain if he had a legitimate purpose to be in the housing project. We discern nothing amiss in that inquiry. In doing so, the officers were attempting to follow their Department guidelines, which were specifically referenced in Dangerfield, supra, 171 N.J. at 452, 457, 795 A.2d 250, a case that also arose from a stop, arrest and search of an individual leaving the same housing project in Long Branch. Id. at 451, 795 A.2d 250. Defendant's questioning dealt solely with his right to be in the complex and, as results would prove, served that singular and appropriate purpose.
C. Probable Cause
Nevertheless, defendant contends that his answers did not provide probable cause to arrest him for defiant trespass. Somewhat ironically, defendant argues that because his answers were so evasive, there could have been no way for the officers to ascertain whether he was lawfully there. Therefore, defendant submits *588 that the police could not have had probable cause to arrest him without first conducting their own independent investigation. However, defendant relies on a misreading of the factually inapposite State in the Interest of J.M., 339 N.J.Super. 244, 771 A.2d 651 (App.Div.2001), to support his argument that the burden was on the officers to prove, through independent investigation, that the non-resident defendant was a trespasser. Additionally, defendant's argument would seemingly reward his failure to cooperate with the police and provide an insurmountable bar for law enforcement to overcome when trying to arrest a person for trespass.
The State responds that the officers had probable cause to arrest defendant for defiant trespass. We agree. N.J.S.A. 2C:18-3(b) provides, in pertinent part, as follows:
A person commits a petty disorderly persons offense if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given by:
. . . .
(2) posting in a manner prescribed by law or reasonably likely to come to the attention of intruders.
Therefore, the question is whether the facts available to the officers supported a well-grounded suspicion that defendant was not licensed or privileged to enter or to remain at the housing complex. Based on the totality of the circumstances, the facts established that probable cause existed to arrest defendant.
Probable cause "eludes precise definition." Wildoner v. Borough of Ramsey, 162 N.J. 375, 389, 744 A.2d 1146 (2000). In general terms, it "means less than legal evidence necessary to convict though more than mere naked suspicion." State v. Mark, 46 N.J. 262, 271, 216 A.2d 377 (1966). Probable cause exists if at the time of the police action there is "a `well grounded' suspicion that a crime has been or is being committed." State v. Waltz, 61 N.J. 83, 87, 293 A.2d 167 (1972) (quoting State v. Burnett, 42 N.J. 377, 387, 201 A.2d 39 (1964)). Probable cause has been characterized "as a common-sense, practical standard." State v. Novembrino, 105 N.J. 95, 120, 519 A.2d 820 (1987).
Probable cause is a flexible, non-technical concept. It includes a conscious balancing of the governmental need for enforcement of the criminal law against the citizens' constitutionally protected right of privacy. It must be regarded as representing an effort to accommodate those often competing interests so as to serve them both in a practical fashion without unduly hampering the one or unreasonably impairing the significant content of the other.
[State v. Sullivan, 169 N.J. 204, 211, 777 A.2d 60 (2001) (quoting State v. Kasabucki, 52 N.J. 110, 116, 244 A.2d 101 (1968)).]
Thus, although several factors considered in isolation may not be enough, cumulatively those pieces of information may "become sufficient to demonstrate probable cause." State v. Zutic, 155 N.J. 103, 113, 713 A.2d 1043 (1998).
Here, taking together all of the facts recited above, the officers had "a `well grounded' suspicion that a crime [had] been or [was] being committed." Waltz, supra, 61 N.J. at 87, 293 A.2d 167. Thus, there was probable cause to arrest defendant for defiant trespass. Dangerfield, supra, 171 N.J. at 460, 795 A.2d 250.
D. The Search
In Dangerfield, supra, 171 N.J. at 458-60, 795 A.2d 250, the Court rejected our view that an individual arrested for the *589 petty disorderly persons offense of defiant trespass should only have been issued a summons, rather than being subjected to a custodial arrest. See also LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 5.2(g) (4th Ed. 2004). As a result, we must now confront the scope of a search incident to that arrest, an issue the Court found it unnecessary to decide in Dangerfield, supra, 171 N.J. at 461-64, 795 A.2d 250.
As Professor LaFave has developed at length, we conclude that once the police determine to make a custodial arrest, as here, their authority to conduct an essentially unlimited search of the arrestee's person follows as a matter of course.[2] LaFave, supra, § 5.2. There is, in such circumstances, no need for the police to determine whether and where they may find evidence of the offense for which the arrest is made. Id. at 5.2(c). In the present case, of course, as the Court noted in Dangerfield, supra, 171 N.J. at 464, 795 A.2d 250, there is no evidence or instrumentality of the offense of defiant trespass.
However, a search for weapons, justified by safety concerns, is likewise not limited. LaFave, supra, § 5.2(d). In Dangerfield, the Court noted its agreement with our opinion in that case that there was "nothing in the record to support a [Terry] frisk for weapons." State v. Dangerfield, 339 N.J.Super. 229, 243, 771 A.2d 642 (App. Div.2001), aff'd in part, modified in part, 171 N.J. 446, 795 A.2d 250 (2002). The reference of course was to the seminal "stop and frisk" case, Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). That decision requires that an officer reasonably believe "that the suspect is dangerous and the suspect may gain immediate control of weapons." Dangerfield, supra, 171 N.J. at 464, 795 A.2d 250 (quoting Michigan v. Long, 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201, 1220 (1983) (quoting Terry, supra, 392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906)). See also State v. Thomas, 110 N.J. 673, 678-85, 542 A.2d 912 (1988). Just as the Court concluded with respect to Dangerfield, we conclude that the record in this case does not support a search of Daniels under the Terry/Thomas standard.
However, we do not read the Court's reference to Terry as constituting a holding that the stop and frisk standard provides the justification required to sustain a search incident to arrest. Clearly, the brief reference in Dangerfield is dictum, given that the Court was discussing an issue that it specifically stated did not need to be resolved.
On the merits, the Court had actually presaged its view on this reserved issue in State v. Pierce, 136 N.J. 184, 642 A.2d 947 (1994), a decision rejecting, as applied to arrests for motor vehicle offenses, the rationale of New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), which had authorized a search of the passenger compartment of an automobile as a contemporaneous incident of an arrest of an automobile occupant. Pierce, supra, 136 N.J. at 186, 208-15, 642 A.2d 947. In the course of that opinion, the Court stated:
Our holding that the Belton rule shall not apply indiscriminately to searches incident to warrantless arrests for motor-vehicle offenses poses no obstacle to law enforcement or to the ability of police officers to take precautions necessary for their safety. Thus, our holding does not affect the right of a police officer, following a valid custodial arrest *590 for a motor-vehicle violation or for a criminal offense, to conduct a search of the person of the arrestee solely on the basis of the lawful arrest. See Gustafson [v. Florida, 414 U.S. 260, 265-66, 94 S.Ct. 488, 491-92, 38 L.Ed.2d 456, 461 (1973)]; U.S. v. Robinson, 414 U.S. 218, 235-36, 94 S.Ct. 467, 477, 38 L.Ed.2d 427, 440-41 (1973).
[Id. at 213-14, 642 A.2d 947.]
That holding was reaffirmed in Dangerfield, supra, 171 N.J. at 463, 795 A.2d 250, where the Court noted that its "restrictive approach concerning arrests for minor traffic offenses is not applicable to Code offenses."
As Professor LaFave points out, analogizing search-incident-to-arrest to stop-and-frisk cases, specifically Terry, is not appropriate. LaFave, supra, § 5.2(d). While the need to search an in-custody arrestee for weapons is clear, the more difficult question is whether such a search is limited to a Terry frisk. LaFave concludes that the authority to search arrestees for weapons should not be so limited, LaFave, supra, § 5.2(d) at 113, it being "very doubtful whether any realistic intensity limitation upon such searches is feasible." Id. at 114. We agree. In the companion cases of United States v. Robinson, supra, and Gustafson v. Florida, supra, both cited in Pierce, supra, the United States Supreme Court held that the Fourth Amendment permitted a full search of an individual incident to a custodial arrest, even for a traffic-type offense. Of course, Pierce rejected that broad holding under our State Constitution, with respect to "routine" traffic offenses. Nevertheless, the rationale of Robinson and Gustafson cannot be ignored as it applies to searches incident to arrest for offenses covered by our Penal Code. See LaFave, supra, § 5.2(a), (b).
While it has been suggested that a frisk, as defined by the Supreme Court in Terry, supra, 392 U.S. at 17 n. 13, 88 S.Ct. at 1877 n. 13, 20 L.Ed.2d at 903 n. 13, is extremely broad and, as a result, "offers substantial protection to the officer," U.S. v. Robinson, 471 F.2d 1082, 1099 (D.C.Cir. 1972), experience teaches that most street frisks are limited to "patdowns" and not the more expansive type of search referred to in Terry. LaFave, supra, § 502(d) at 112-13. As LaFave has noted, id. at 113, a search incident to an in-custody arrest should not be limited to "bulky guns and knives which could be readily detected in a patdown, nor to those weapons to which the arrestee has immediate access in the outer areas of his clothing." In support of that conclusion, he quoted, ibid., the following from Justice Marshall's dissent in Robinson, supra, 414 U.S. at 254, 94 S.Ct. at 485, 38 L.Ed.2d at 451:
If the individual happens to have a weapon on his person, he will certainly have much more opportunity to use it against the officer in the in-custody situation [than in a Terry type of case]. The prolonged proximity also makes it more likely that the individual will be able to extricate any small hidden weapon which might go undetected in a weapons frisk, such as a safety pin or razor blade. In addition, a suspect taken into custody may feel more threatened by the serious restraint on his liberty than a person who is simply stopped by an officer for questioning, and may therefore be more likely to resort to force.
We agree with Professor LaFave that if, incident to a custodial arrest, an officer can, pursuant to Terry, remove an object from a suspect's pocket that is believed to be a dangerous weapon,
[a]n object not clearly identifiable as something other than a `small hidden weapon' must be amenable to further *591 inspection. And if the object is a container which might have some kind of weapon within it, it seems reasonable that the officer should look inside of that object, as the Supreme Court appears to have decided in Peters v. New York [392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968)]. The alternative, requiring the officer to retain all such objects without inspecting them, is less than practicable.
[LaFave, supra, § 5.2(d) at 113-14.]
It is true that other states have limited searches incident to arrest to Terry-type frisks, State v. Paul T., 128 N.M. 360, 993 P.2d 74, 78-79 (1999) (violation of juvenile curfew ordinance); People v. Maher, 17 Cal.3d 196, 130 Cal.Rptr. 508, 550 P.2d 1044 (1976) (arrest for public intoxication); Hawaii v. Rosborough, 62 Haw. 238, 615 P.2d 84 (1980) (arrest for marijuana possession); see also Middleton v. State, 577 P.2d 1050, 1055 (Alaska 1978). Others, however, have adopted the more expansive position espoused herein. State v. Florance, 270 Or. 169, 527 P.2d 1202 (1974) (arrest for menacing an officer); Hughes v. State, 522 P.2d 1331 (Okla.Crim.App.1974) (arrest for reckless driving and driving without valid license); People v. Weintraub, 35 N.Y.2d 351, 361 N.Y.S.2d 897, 320 N.E.2d 636 (1974) (arrest for criminal trespass).
The only question is whether the very minor nature of this offense, being the lowest on the scale of violations covered by the Code, should invoke a different rule. We think not. It would simply be too impracticable to differentiate the scope of a search incident to arrest depending on the degree of the violation, other than motor vehicle offenses or, possibly, municipal ordinance violations. Cf. State v. Hurtado, 219 N.J.Super. 12, 23-28, 529 A.2d 1000 (App.Div.1987) (Skillman, J.A.D., dissenting), rev'd o.b. on dissent, 113 N.J. 1, 549 A.2d 428 (1988) (discussing authority of police to arrest for municipal ordinance violation). We consider it unlikely that the police will decide to take more people arrested for minor offenses into custody in order to search them than would otherwise be the case. The police power to arrest in the first instance for these minor offenses is restricted to non-pretextual arrests, Dangerfield, supra, 171 N.J. at 463, 795 A.2d 250, but once the decision is made to take the person into custody and transport him to police headquarters, a full search should be permitted.
Applied to the facts of this case, there is no doubt that the search of defendant's person was permissible. Indeed, even if a Terry frisk limitation were imposed, the patdown here went no further than permitted under that rationale. The officer felt a hard object in defendant's pocket that he felt might be a knife. Even putting aside the officer's subjective belief, he had the right to examine the object to determine if it might be a weapon, regardless of what type of weapon. In retrieving the item, which turned out to be a lighter, the plastic bag came into view.[3] There is no basis to conclude, given these facts, that defendant's rights, under either the Fourth Amendment or our State Constitution, N.J. Const. art. I § 7, were violated.[4]
Affirmed.
NOTES
[1] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[2] Our ruling does not go so far as to sanction warrantless searches, even incident to arrest, which involve intrusions into the body. See LaFave, supra, § 5.3(c).
[3] Defendant has made no argument concerning how the plastic bag came to be seen by the officer and, as we noted earlier, the record sheds no light on that discovery.
[4] We do not address the entirely separate matter of a search at the stationhouse prior to placing an arrestee in a cell. See LaFave, supra, § 5.2(d) at 114 n. 89 and § 5.3.