NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-3611-15T1

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

JIHAD EWING,

 Defendant-Appellant.

____________________________

 Submitted April 26, 2017 – Decided August 30, 2017

 Before Judges Fuentes and Gooden Brown.

 On appeal from Superior Court of New Jersey,
 Law Division, Camden County, Indictment No.
 14-09-2760.

 Eugene P. Tinari, attorney for appellant.

 Mary Eva Colalillo, Camden County Prosecutor,
 attorney for respondent (Maura G. Murphy,
 Assistant Prosecutor, of counsel and on the
 brief).

PER CURIAM

 Defendant Jihad Ewing appeals from a January 19, 2016 judgment

of conviction for second-degree unlawful possession of a handgun,

N.J.S.A. 2C:39-5(b). Defendant moved to suppress the handgun
seized without a warrant, which formed the evidential basis for

the gun possession charge. When his motion was denied, defendant

entered a negotiated guilty plea and was sentenced to a five-year

term of imprisonment, with a three-year period of parole

ineligibility, in accordance with the Graves Act, N.J.S.A. 2C:43-

6(c). On appeal, defendant challenges the denial of his motion

to suppress the handgun, arguing the police had neither "reasonable

suspicion [nor] probable cause to stop the [d]efendant's vehicle

nor could they establish a reasonable and articulable suspicion

that defendant was armed." We disagree and affirm.

 I.

 At the suppression hearing conducted on July 10 and September

11, 2015, the following facts were adduced. On December 15, 2011,

New Jersey State Troopers Salvatore Lopresti, Jr., and Bryan Burke,

both veteran officers, were patrolling Sixth Avenue and Ferry

Street in Camden in an unmarked black SUV as part of a surge detail

to combat "open air drug" and other violent criminal activity. At

approximately midnight, the troopers observed a silver Dodge wagon

with tinted windows "just parked randomly on the side of the road"

in a dark, deserted residential area with "no other vehicles or

traffic around." According to Lopresti, the vehicle was suspicious

based on "where it was parked, . . . the location it was parked,

[and] how it was parked." Lopresti testified, "there's not really

 2 A-3611-15T1
a parking spot there for that vehicle." Burke testified that the

vehicle was suspicious because "[i]t wasn't in a parking space"

and "[i]t was kind of stopped in the middle of the road." Moreover,

according to Burke, he could see that "the driver had his foot on

the brake" because "the brake lights were on[.]"

 The troopers pulled up about four to five feet behind the

vehicle with their headlights shining directly into the vehicle.

While Burke, who was driving, testified that he activated the

emergency lights, Lopresti could not recall whether the emergency

lights were activated. From behind the vehicle, the troopers

observed two occupants in the car, the driver and a front seat

passenger. According to Lopresti, for about two seconds, the

front seat passenger and the driver "duck[ed] out of view[,]" as

if "they were doing something underneath . . . their seat," and

then "popp[ed] back up." Lopresti believed the occupants of the

vehicle were trying to hide something. Burke testified he could

"see the suspension shift on the tires of the car moving back and

forth a little bit, along with the movement of the driver's

silhouette[,]" and "it appeared that the driver's silhouette did

kind of lower himself below the headrest of the vehicle."

 While observing the movement in the Dodge wagon, the troopers

immediately exited their vehicle and approached the car, Lopresti

going to the passenger's side and Burke going to the driver's

 3 A-3611-15T1
side. Burke knocked on the window to identify himself and asked

the driver to put down his window. Burke repeated the request

when the driver did not put the window down all the way. After

Burke repeated the request, the driver complied. Fearing for his

safety, Burke told the driver to exit the vehicle so that he could

perform a frisk for weapons. The driver, later identified as

defendant, stated "I have a gun." At that point, Burke handcuffed

defendant and patted him down. From defendant's waistband, Burke

recovered a semi-automatic handgun loaded with hollow-nosed

bullets, and placed defendant under arrest.

 In ruling on the suppression motion, preliminarily, the judge

found both troopers' testimony to be credible, noting "they

answered the questions without hesitation[,] or any apparent

evasion, and when they were not sure of an answer[,] answered in

the appropriate manner." The judge then made factual findings

consistent with the troopers' testimony. The judge found that the

troopers were patrolling an area "known for open air drug sets and

criminal activity" when "they observed defendant's vehicle" in

circumstances that aroused their suspicions. The judge also

credited both troopers' testimony that "they observed movements

in defendant's vehicle after . . . the troopers pulled behind

defendant's vehicle." The judge explained,

 4 A-3611-15T1
 In their testimony both troopers stated
 that the observation of these movements made
 them suspicious, and that, through their
 training and experience, these actions were
 consistent with someone attempting to conceal
 something in the vehicle.

 Finding that the troopers had reasonable suspicion to conduct

an investigatory stop, and specific and articulable facts that

would warrant heightened caution to justify ordering defendant out

of the car for officer safety, the judge upheld the search and

seizure. Regarding the propriety of the initial encounter, the

judge reasoned:

 As in [State v. Hughes, 296 N.J. Super. 291
 (App. Div. 1997)], the knowledge and
 experience of Troopers Burke and Lopresti,
 coupled with their observations of defendant's
 vehicle stopped either in the middle or
 towards the side of the road, not in a parking
 space, with no cars nearby, with no . . .
 houses nearby, near midnight, in a high crime
 area aroused their suspicion. . . .

 Hughes . . . suggests that the use of emergency
 lights or searchlights amounts to a seizure
 under the Fourth Amendment, thus requiring
 reasonable suspicion.

 Given the inconclusive testimony
 regarding the activation of the emergency
 lights, this [c]ourt will analyze the
 circumstances of defendant's arrest under the
 more exacting standard in which reasonable
 suspicion must have existed at the time [the]
 troopers engaged the emergency lights.

 Assuming, for purposes of this motion,
 that the emergency lights were activated, an
 investigatory stop commenced when Trooper

 5 A-3611-15T1
 Burke activated the emergency lights . . .
 because simultaneous with that action police
 exited their vehicle and moved to either side
 of the defendant's stopped vehicle, thus
 giving rise to circumstances where, after
 consideration of the "totality of the
 circumstances a reasonable person would feel
 that the police had encroached on his or her
 freedom to leave." [State v. Daniels, 393 N.J.
 Super. 476, 484 (App. Div. 2007)].

 Here, under these facts, as this [c]ourt
 finds them to be, reasonable suspicion existed
 because the testimony of Troopers Burke and
 Lopresti demonstrated . . . "a particularized
 and objective basis for suspecting the person
 stopped of criminal activity[.]" [State v.
 Stovall, 170 N.J. 346, 356 (2002).] [U]nlike
 [State v. Dangerfield, 339 N.J. Super. 229
 (App. Div. 2001)], where the Supreme Court
 held that officers did not have reasonable
 suspicion or probable cause to stop the
 defendant based solely upon the fact that the
 defendant was in a high crime area and the
 defendant took flight upon observing law
 enforcement, troopers in the present matter
 established reasonable suspicion through the
 circumstances of encountering defendant, the
 actions of defendant, and the high crime area
 in which the trooper encountered defendant.

 . . . .

 Taken together, these facts amount to greater
 reasonable suspicion than "mere presence in
 an area known for its drug activity," as held
 in Dangerfield[.]

 In evaluating the propriety of ordering defendant to exit the

vehicle, citing State v. Smith, 134 N.J. 599 (1994), the judge

acknowledged that "ordering a person from a vehicle requires more

than a hunch" and "an officer must be able to point to specific

 6 A-3611-15T1
and articulable facts that would warrant heightened caution to

justify ordering the occupants to step out of a vehicle." The

judge found that based on the time, location and circumstances of

the encounter, and after observing movement in defendant's

vehicle, which aroused the trooper's suspicions and engendered

their belief that the occupants "[were] concealing something in

the vehicle[,] . . . Trooper Burke credibly testified that at that

moment he began to fear for his safety, and he was concerned that

defendant may have had a firearm in the vehicle." According to

the judge, "[d]efendant's reluctance to roll down his window,"

despite his ultimate compliance after repeated requests from

Trooper Burke, further "raised the level of suspicion."

 The judge concluded:

 Here, based upon the credible testimony,
 Troopers Burke and Lopresti demonstrated
 specific and articulable facts that justified
 Trooper Burke's ordering of defendant out of
 his vehicle.

 . . . .

 Finally, whether the handgun was lawfully
 seized pursuant to a frisk of defendant's
 person, pursuant to [Terry v. Ohio, 392 U.S.
 1, 88 S. Ct. 1868, 20 L. Ed.2d 889 (1968)] a
 limited exploratory frisk of the subject's
 person is permissible to preserve the safety
 of an officer if under the circumstances the
 officer reasonably believes that the suspect
 may be armed and dangerous. [State v. Arthur,
 149 N.J. 1, 13 (1997)].

 7 A-3611-15T1
 . . . .

 Here, prior to performing a frisk
 defendant stated to Trooper Burke, "I have a
 gun," . . . as he exited the vehicle. As of
 this time no frisk had been conducted. . . .
 [A]s the defendant told Trooper Burke that he
 had a weapon, Trooper Burke had a reasonable
 belief that defendant was armed and dangerous.

 II.

 On appeal, defendant argues:

 1. THE TRIAL COURT ERRED WHEN IT DENIED THE
 [APPELLANT'S] MOTION TO SUPPRESS PHYSICAL
 EVIDENCE.

 A. THE LEVEL OF SUSPICION
 NECESSARY FOR A TRAFFIC STOP BASED
 ON A TRAFFIC VIOLATION UNDER WHREN
 V. [U.S.]1 IS PROBABLE CAUSE, NOT
 REASONABLE ARTICULABLE SUSPICION.

 B. THERE WAS NO REASONABLE
 ARTICULABLE SUSPICION OR PROBABLE
 CAUSE TO CONDUCT A VEHICLE STOP OF
 THE APPELLANT'S VEHICLE.

 C. THERE WAS NO REASONABLE
 ARTICULABLE SUSPICION OR PROBABLE
 CAUSE TO CONDUCT AN INVESTIGATORY
 DETENTION AND SUBSEQUENT FRISK.

 We review a motion judge's factual findings in a suppression

hearing with great deference. State v. Gonzales, 227 N.J. 77, 101

(2016). In our review of a "grant or denial of a motion to

1
 Whren v. U.S., 517 U.S. 806, 116 S. Ct. 1769, 135 L. Ed. 2d 89
(1996).

 8 A-3611-15T1
suppress [we] must uphold the factual findings underlying the

trial court's decision so long as those findings are supported by

sufficient credible evidence in the record." State v. Gamble, 218

N.J. 412, 424 (2014). We defer "to those findings of the trial

judge which are substantially influenced by [her] opportunity to

hear and see the witnesses and to have the 'feel' of the case,

which a reviewing court cannot enjoy." State v. Elders, 192 N.J.

224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161

(1964)). We owe no deference, however, to the trial court's legal

conclusions or interpretation of the legal consequences that flow

from established facts. Our review in that regard is de novo.

State v. Watts, 223 N.J. 503, 516 (2015); State v. Vargas, 213

N.J. 301, 327 (2013).

 In State v. Rosario, 229 N.J. 263, 272 (2017, our Supreme

Court recently reaffirmed that a police officer may conduct an

"investigative detention, also called a Terry2 stop or an

investigatory stop," if during an encounter with a citizen the

officer has "'reasonable and particularized suspicion . . . that

an individual has just engaged in, or was about to engage in,

criminal activity.'" Ibid. (quoting State v. Stovall, 170 N.J.

346, 356 (2002). Here, the motion judge found Burke met this

2
 Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889
(1968).

 9 A-3611-15T1
standard when he and his partner decided to investigate defendant's

vehicle. It is beyond dispute that the Troopers had probable

cause to arrest defendant once defendant voluntarily stated: "I

have a gun." As the motion judge correctly noted, defendant made

this statement before he exited the vehicle, thus obviating the

need for Burke to conduct a Terry pat down.

 Affirmed.

 10 A-3611-15T1