**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5364-14T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

KENNETH E. BURRELL a/k/a
KENNETH BURRELL, KEVIN BOOKER,
KEVIN BURRELL and KEITH BURRELL,

    Defendant-Appellant.

_____

        Submitted March 8, 2017 — Decided September 11, 2017

        Before Judges Fuentes and Gooden Brown.

        On appeal from the Superior Court of New
        Jersey, Law Division, Monmouth County,
        Indictment No. 13-06-1106.

        Joseph E. Krakora, Public Defender, attorney
        for appellant (Daniel V. Gautieri, Assistant
        Deputy Public Defender, of counsel and on the
        brief).

        Christopher S. Porrino, Attorney General,
        attorney for respondent (Sara M. Quigley,
        Deputy Attorney General, of counsel and on the
        brief).

        Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Kenneth Burrell appeals from a July 2, 2015 judgment of conviction for second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1).  Defendant moved to suppress the handgun seized without a warrant, which formed the evidential basis for the charge.  When his motion was denied, defendant entered a negotiated guilty plea and was sentenced to a seven-year term of imprisonment, with a five-year period of parole ineligibility, in accordance with the Graves Act, N.J.S.A. 2C:43-6(c).[1]  On appeal, defendant challenges the denial of his suppression motion as permitted under Rule 3:5-7(d).  We affirm.

At a suppression hearing conducted on June 26 and August 20, 2014, the following facts were adduced.  Officers assigned to the Asbury Park Police Department's Street Crimes Unit (SCU) patrolled an area of the city known for drug trafficking, shootings, and gang related activities.  Gang members reportedly used their girlfriends as gun couriers, believing that they were less likely to be searched.  SCU officers wore special uniforms consisting of sweatshirts with "Police" printed in large gold letters across the front and back and badges suspended around their necks.  They

---

[1] Defendant also pled guilty and was sentenced to a concurrent three-year term on an unrelated drug possession charge.  Defendant does not challenge that conviction in this appeal.

drove unmarked police vehicles equipped with lights inside the windshield, on the visor, on the front grille, and on the back.

On December 14, 2012, at about 9:00 p.m., SCU Officer Lorenzo Pettway and his partners, Sergeants John Crescio and Michael Barnes, were travelling east on the 1400 block of Summerfield Avenue, an area that had nightly shootings and two prior homicides. It was a clear, cold night and the area was lit with street lights every couple hundred feet. On the sidewalk on the opposite side of the roadway, Pettway observed a man, he later recognized as defendant, and a woman, later identified as Christine Labord, walking side by side and talking. When defendant observed the police car, he pulled his hood tightly so that it covered part of his face, slowed his gait, and dropped back as Labord continued walking, creating a distance between them of a few feet.

Acknowledging that defendant's actions appeared suspicious, Pettway pulled alongside the couple to stop and talk to them. As Pettway pulled over, the couple stopped and looked in his direction.[2] Pettway exited his vehicle, approached defendant and asked how he was doing and whether he could speak to him for a

---

[2] Defendant called as a witness an optometrist who examined him about a year later, to establish that over the past few months, defendant developed a detached retina, resulting in loss of vision in his right eye and, if left uncorrected, reduced vision in his left eye.

minute. Pettway then approached Labord while his partners remained with defendant. According to Pettway, as he approached, Labord appeared nervous and clutched her large purse tightly against her body. In a casual, conversational tone, Pettway identified himself and asked Labord her name, how she was doing, where she was going, and where she was coming from. Labord was cooperative and responded to Pettway's questions. She explained they had just come from her house and were going across town to a friend's house. While she spoke, she continued to clutch her purse and appeared nervous. Pettway then asked Labord what she had in the purse. At that point, Labord "immediately took her purse off her shoulder[]," opened it up and said "[h]e made me carry it, it [isn't] mine" "it's his gun[.]" With his flashlight, Pettway observed the handle of a gun in Labord's purse.

Labord immediately seized the gun, which he described as a Tec-9 sub-machine gun that "qualifies as an assault firearm[.]" Labord passed the gun to Crescio who cleared it and recovered twenty-four rounds of ammunition from it. As Pettway placed Labord under arrest, defendant repeatedly admitted to Pettway that it was his gun and asked Pettway not to arrest her. At that point, defendant was also placed under arrest. Both defendant and Labord were placed in a marked police vehicle that was summoned to the scene. While in the police vehicle, Pettway read defendant and

Labord their Miranda[3] rights, which they acknowledged understanding. Defendant continued insisting that it was his gun. At police headquarters, during custodial interrogations, both defendant and Labord gave incriminating statements after being advised of their Miranda rights a second time.

In an August 25, 2014 written statement of reasons, the motion judge upheld the seizure. The judge found Officer Pettway, the sole State witness, to be "a credible and uncontradicted witness" and made factual findings consistent with Pettway's testimony. The judge determined that the street encounter was "a lawful field inquiry" during which Labord voluntarily showed police the gun, leading to the lawful seizure and spontaneous admissions. The court noted:

> The police acknowledge that they saw no criminal activity . . . , they did not block the defendants from walking away and, if the defendants had chosen to walk away the police would have allowed them to do so. Officer Pettway, in a voice that was calm, regular and casual, asked defendant Labord if he could talk with her. Defendant Labord, appearing nervous, clutched her purse close to herself, and Officer Pettway asked defendant Labord what was in the purse. Given these circumstances, this was a field inquiry. Defendant Labord voluntarily opened her purse, showed Officer Pettway the gun, and stated that defendant Burrell made her carry it.

---

[3] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Defendant Burrell then voluntarily stated that it was his gun. All of this took only seconds.

The judge determined that Pettway was then justified in seizing the gun under the plain view exception to the warrant requirement. Further, the judge found that in addition to defendant's "spontaneous and unsolicited pre-_Miranda_ statements[,]" they gave recorded statements at police headquarters after being notified of their _Miranda_ rights and "knowingly, intelligently, and voluntarily waiv[ing] those rights[.]" The judge entered a memorializing order on the same date and this appeal followed.

On appeal, in his counseled brief, defendant makes the following argument:

> WHEN THE POLICE OFFICER ASKED CO-DEFENDANT LABORD WHAT SHE HAD IN HER PURSE, THE FIELD INQUIRY BECAME AN INVESTIGATORY STOP WHICH WAS INVALID BECAUSE THE OFFICER CANDIDLY ACKNOWLEDGED THAT HIS INQUIRY WAS PROMPTED BY A MERE HUNCH.

In his pro-se supplemental brief, defendant makes the following argument:

> TRIAL COURT ERRED IN DENYING DEFENDANT-APPELLANT NOTICE OF MOTION TO SUPPRESS THE EVIDENCE[].

We review a motion judge's factual findings in a suppression hearing with great deference. State v. Gonzales, 227 _N.J._ 77, 101 (2016). In our review of a "grant or denial of a motion to

suppress [we] must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Gamble, 218 N.J. 412, 424 (2014). We defer "to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). We owe no deference, however, to the trial court's legal conclusions or interpretation of the legal consequences that flow from established facts. Our review in that regard is de novo. State v. Watts, 223 N.J. 503, 516 (2015).

Defendant argues "the police engaged in an investigatory stop, without the requisite reasonable and articulable suspicion" that defendant and his companion "were engaged in criminal activity[.]" Accordingly, defendant contends that "the search was invalid and any statements that followed were inadmissible as the fruit of the poisonous tree." We disagree and affirm substantially for the reasons expressed by the motion judge. We add the following comments.

The constitutional requirements for a field inquiry and an investigatory stop are different. "A field inquiry is essentially a voluntary encounter between the police and a member of the public

in which the police ask questions and do not compel an individual to answer." State v. Rosario, 229 N.J. 263, 271 (2017). Except for impermissible reasons such as race, a field inquiry "may be conducted without grounds for suspicion." State v. Daniels, 393 N.J. Super. 476, 484 (App. Div. 2007) (citation omitted). A field inquiry is the least "intrusive[] . . . encounter[] with police[.]" Rosario, supra, 229 N.J. at 271. Indeed, "[t]he individual does not even have to listen to the officer's questions and may simply proceed on [his or] her own way." Rosario, supra, 229 N.J. at 271.

"The test of a field inquiry is 'whether [a] defendant, under all of the attendant circumstances, reasonably believed he [or she] could walk away without answering any of [the officer's] questions." Id. at 271-72 (quoting State v. Md., 167 N.J. 471, 483 (2001)). So long as the officers "questions were put in a conversational manner, if he [or she] did not make demands or issue orders, and if his [or her] questions were not overbearing or harassing in nature[,]" the encounter "could be treated as [a] field inquiry." Id. at 274 (citations omitted).

Unlike a field inquiry, an investigatory stop, also referred to as a Terry[4] stop, is characterized by a detention in which "'an

_____

[4] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

A-5364-14T1

objectively reasonable person' would feel 'that his or her right to move has been restricted[,]'" even though the encounter falls short of a formal arrest. Id. at 272 (quoting State v. Rodriquez, 172 N.J. 117, 126 (2002)). An investigatory stop "is a temporary seizure that restricts a person's movement[.]" Ibid. Accordingly, "it must be based on an officer's 'reasonable and particularized suspicion . . . that an individual has just engaged in, or was about to engage in, criminal activity.'" Ibid. (quoting State v. Stovall, 170 N.J. 346, 356 (2002)). "During such a stop, if the police officer believes that the suspect 'may be armed and presently dangerous,' then he may conduct a pat down" for the officer's safety. State v. Williams, 192 N.J. 1, 9 (2007) (quoting Terry, supra, 392 U.S. at 30, 88 S. Ct. at 1884, 20 L. Ed. 2d at 911)).

Applying these principles, we agree that defendant's street encounter with Pettway amounted to no more than a field inquiry for the reasons expressed by the motion judge. Specifically, the motion judge found defendant's and Labord's interactions with the police officers did not unreasonably restrict their freedom of movement. The officers' demeanor was not confrontational and their questions sought only the type of general information associated with a field inquiry. We thus find no merit to

defendant's contentions that Pettway conducted an investigatory stop by asking Labord what was in her purse.

The record shows that Labord voluntarily revealed that she was carrying the firearm in her purse. Defendant thereafter voluntarily admitted that he was the actual owner of the weapon. Stated differently, defendant made this self-incriminating statement spontaneously, not in response to a police officer's question. Under these circumstances, unsolicited statements made by a defendant are admissible "because they were not the product of police interrogation or its functional equivalent." State v. Cryan, 363 N.J. Super. 442, 454 (App. Div. 2003).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5364-14T1