NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1016-14T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RICHARD BARD, a/k/a
RICHARD BARD, JR.,

    Defendant-Appellant.

_____

> **APPROVED FOR PUBLICATION**
>
> **APRIL 19, 2016**
>
> **APPELLATE DIVISION**

Argued January 11, 2016 — Decided February 29, 2016

Before Judges Lihotz, Fasciale and Higbee.

On appeal from Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 13-11-0875.

Rochelle Watson, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Ms. Watson, of counsel and on the brief).

Steven A. Yomtov, Deputy Attorney General, argued the cause for respondent (John J. Hoffman, Acting Attorney General, attorney; Carol M. Henderson, Assistant Attorney General, of counsel and on the brief; Lynne M. Glass, Volunteer Attorney, on the brief).

The opinion of the court was delivered by

LIHOTZ, P.J.A.D.

Defendant Richard Bard appeals from a September 9, 2014 judgment of conviction, following his conditional guilty plea to the amended disorderly person's offense of possession of marijuana, N.J.S.A. 2C:35-10(a)(4). He was sentenced to a 180-day county jail term and a 180-day period of parole disqualification.

Defendant entered his plea following the denial of his motion to suppress. In a single point on appeal, he argues:

> DEFENDANT'S UNWILLINGNESS TO TALK TO THE POLICE DURING THE FIELD INQUIRY COUPLED WITH HIS PUTTING HIS HAND IN HIS BACK POCKET DID NOT PROVIDE REASONABLE SUSPICION TO SEIZE AND FRISK HIM.

Following our review of the arguments, in light of the facts and applicable law, we conclude the totality of circumstances satisfied the State's burden to show the State Troopers had a reasonable articulable suspicion defendant was armed, necessitating a stop and frisk. Accordingly, we affirm.

These facts are taken from the suppression hearing record.[1] New Jersey State Trooper Chris Paligmo, one of two arresting officers, was the sole testifying witness.[2]

---

[1] After noting variations in spelling of certain names found in the transcript and the judge's written opinion, we have chosen to adopt the spelling set forth in the opinion.

[2] Defendant waived his right to testify.

On July 29, 2013, Trooper Paligmo and his partner, Trooper Silipino, were assigned to perform "community policing," in full uniform, at Tips Trailer Park. While assigned to the Bridgeton Barracks, Trooper Paligmo had numerous personal experiences with the area as a high-crime location, testifying he was involved in arrests for multiple homicides, open-air narcotics distribution, burglaries, assaults, weapons offenses, and gang activity. He further noted, "[w]e have the highest call volume in the state" and, in the months preceding defendant's arrest, the Cumberland County Prosecutor's Office transmitted to the barracks "safety alerts with threats . . . saying they were going to harm troopers — that patrolled the area."

As the two troopers patrolled the neighborhood on foot, at 1:30 a.m., they walked along a partially paved path in an area that was not well-lit. The troopers observed defendant walking toward them, approximately thirty-three feet away. Trooper Paligmo attempted to engage defendant, saying: "Hey, bud, what's going on? How you doing?" Defendant displayed no reaction, did not make eye contact and "acted as though he didn't hear us. Head dropped, appeared to be nervous. And tried to . . . walk by us, without acknowledging."

While walking toward the officers, when defendant was approximately ten to fifteen feet away, his hand, which had been

at his side, moved to his back pocket. The troopers then asked him to "show his hands." Defendant did not comply and continued to close the distance between him and the troopers with his hand behind him. At that point, Trooper Silipino "secured" defendant by making "sure he had control of his hand that was out of view." He "pulled" defendant's hand from his pocket and held it while Trooper Paligmo frisked the area of defendant's pocket with his palm. Trooper Paligmo felt a hard bulge that was "quite large," roughly five to six inches in diameter. The trooper also felt the texture of the object and heard a crinkle sound, concluding it was marijuana. He removed it from defendant's pocket, finding a tightly packed bundle containing "a large plastic bag filled with marijuana buds, and also individual[ly] packaged marijuana." Defendant was subsequently arrested.

When asked why he frisked defendant, Trooper Paligmo testified: "I believed he had a weapon. His behavior was very alarming to me; and, being with another trooper, I felt both of our safeties [sic] may have been at risk." He explained his belief in light of his training, stating:

> the hands are described as always the most
> threatening and dangerous part of our job,
> in terms of when you can't see them. That
> hand could always possess any sort of
> weapon. Even including a needle. You are
> told to — at any point of a stop, or a

contact, a pedestrian contact, more or less, that you need to see their hands, because hands pose the most threat.

To deal with that, you ask to see them. You ask a reasonable amount of time, or a reason about a number of times to ask to see those hands[] that you feel comfortable with. After that, then you're trained to see those hands through physical means.

. . . .

[W]e're trained that 21 feet is the . . . distance where you can be affected by somebody just weaving with a knife. They pull a knife, you've got within 21 feet, a matter of seconds, they can be on you without a reaction. So always, we're taught, action is quicker than reaction. And, in this case, that's what's going through our heads; that's going through my head. And, therefore, I thought it was handled the best we could handle it at the time.

On cross-examination, Trooper Paligmo acknowledged when defendant was first observed he was not engaged in criminal activity. He also admitted the fact defendant would not respond to his greeting or that he dropped his head was not necessarily dangerous. However, he stated "hands, that's . . . my primary concern. If I can't see his hands, that makes me nervous. It makes any other trooper nervous." He added, "there are certain people who want to hurt the police or harm the police. And, I'm here to tell you, they're going to harm the police."

A-1016-14T3

The judge issued a comprehensive written opinion. He found Trooper Paligmo's testimony credible and analyzed the police-citizen encounter step by step. He noted when defendant did not respond to the officer's greeting, he was not ordered to stop and his movements were not impeded.

> When the defendant did not respond and placed his hand behind his back and into his rear pocket, he was still free to leave. The [t]roopers did not order him to stop, but simply asked him to show his hand. He did not. There is no evidence before the [c]ourt that had the [d]efendant complied with such a request that anything further would have happened. However, in that brief moment of non-compliance with a reasonable request, the police encounter escalated and involved the detention of the defendant such that his freedom of movement was hampered.

Analyzing the police conduct in detaining defendant and engaging in a Terry frisk,[3] the judge found the reasonable inferences, drawn from the totality of the circumstances, warranted the trooper's belief he and his partner's protection and safety were at risk, justifying the limited frisk for weapons.

Defendant's motion to suppress was denied. Following entry of his conditional guilty plea and sentence, he appealed.

---

[3]    See Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

The Supreme Court has explained the standard of review applicable to our consideration of a trial judge's fact-finding on a motion to suppress.

> We are bound to uphold a trial court's factual findings in a motion to suppress provided those "findings are 'supported by sufficient credible evidence in the record.'" State v. Elders, 192 N.J. 224, 243-44 (2007) (quoting State v. Elders, 386 N.J. Super. 208, 228 (App. Div. 2006)). Deference to those findings is particularly appropriate when the trial court has the "'opportunity to hear and see the witnesses and to have the feel of the case, which a reviewing court cannot enjoy.'" Id. at 244 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). Nevertheless, we are not required to accept findings that are "clearly mistaken" based on our independent review of the record. Ibid. Moreover, we need not defer "to a trial . . . court's interpretation of the law" because "[l]egal issues are reviewed de novo." State v. Vargas, 213 N.J. 301, 327 (2013).
>
> [State v. Watts, 223 N.J. 503, 516 (2015) (alteration in original)]

An appellate court remains mindful not to "disturb the trial court's findings merely because 'it might have reached a different conclusion were it the trial tribunal' or because 'the trial court decided all evidence or inference conflicts in favor of one side' in a close case." Elders, supra, 192 N.J. at 244 (quoting Johnson, supra, 42 N.J. at 162). Rather, we reverse only when the court's findings "are so clearly mistaken 'that

the interests of justice demand intervention and correction.'" Ibid. (quoting Johnson, supra, 42 N.J. at 162).

Defendant argues there was no evidence he was engaged in illegal conduct and his decision not to interact with the police was insufficient to support a stop and frisk. Also, he maintains the unwarranted emphasis on the high crime nature of the area could not "paint a gloss of criminality on what was otherwise innocuous conduct." He urges reversal and suppression of the narcotics seized in the warrantless stop.

We reject defendant's argument, which isolates the individual facts presented. We conclude the trial judge properly considered the totality of the circumstances when determining the reasonableness of the troopers' reaction.

When analyzing a warrantless search and seizure, we start with the parameters defined by our Federal and State Constitutions. These protections require police to first secure a warrant before seizing a person or conducting a search of a home or a person. Watts, supra, 223 N.J. at 513-14; State v. Reece, 222 N.J. 154, 167 (2015).

> [B]oth the Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution guarantee to New Jersey's citizens "[t]he right to walk freely on the streets of a city without fear of an arbitrary arrest." State v. Gibson, 218 N.J. 277[, 281] (2014). When evaluating the reasonableness of a

> detention, the "totality of circumstances surrounding the police-citizen encounter" must be considered. State v. Privott, 203 N.J. 16, 25 (2010) (quoting [State v. Davis, 104 N.J. 490, 504 (1986)]).
>
> [State v. Coles, 218 N.J. 322, 343 (2014) (fist alteration in original).]

The constitution also allows a person the privilege, "upon noting a police presence, to decide that he or she wishes to have nothing to do with the police, without risking apprehension solely by reason of the conduct manifesting that choice." State v. L.F., 316 N.J. Super. 174, 179 (App. Div. 1998) (quoting State v. Ruiz, 286 N.J. Super. 155, 162-63 (App. Div. 1995), certif. denied, 143 N.J. 519 (1996)). "[D]eparture alone signifies nothing more than behavior in fulfillment of a wish to be a somewhere else." Ibid. (quoting Ruiz, supra, 286 N.J. Super. at 163). Thus, police officers may not place their hands on citizens "in search of anything" without "constitutionally adequate, reasonable grounds for doing so." Sibron v. New York, 392 U.S. 40, 64, 88 S. Ct. 1889, 1903, 20 L. Ed. 2d 917, 935 (1968).

While the warrantless seizure of a person is "presumptively invalid as contrary to the United States and the New Jersey Constitutions," Coles, supra, 218 N.J. at 342 (quoting State v. Mann, 203 N.J. 328, 337-38 (2010)), there remains a critical "balance to be struck between individual freedom from police

interference and the legitimate and reasonable needs of law enforcement." Id. at 343. A reviewing court must determine whether the State has met its burden, by a preponderance of the evidence, to establish the warrantless search or seizure of an individual was justified in light of the totality of the circumstances. See Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527, 548 (1983).

The parameters for an investigatory stop are well-defined.

> [A] police officer may conduct an investigatory stop of a person if that officer has "particularized suspicion based upon an objective observation that the person stopped has been or is about to engage in criminal wrongdoing." State v. Davis, 104 N.J. 490, 504 (1986)[.] The stop must be reasonable and justified by articulable facts; it may not be based on arbitrary police practices, the officer's subjective good faith, or a mere hunch.
>
> [Coles, supra, 218 N.J. at 343 (citation omitted).]

The Terry exception to the warrant requirement permits a police officer to detain an individual for a brief period, and to pat him down for the officer's safety, if that stop is "based on 'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." State v. Rodriquez, 172 N.J. 117, 126 (2002) (quoting Terry, supra, 392 U.S. at 21, 88 S. Ct. at 1880, 20 L. Ed. 2d at 906); see also State v. Williams, 192

N.J. 1, 9 (2007) (quoting Terry, supra, 392 U.S. at 30, 88 S. Ct. at 1884, 20 L. Ed. 2d at 911) (stating a Terry pat down is constitutionally permissible when the police officer believes the suspect "may be armed and presently dangerous").

When reviewing whether the State has shown a valid investigative detention, consideration of the totality of the circumstances requires we "give weight to 'the officer's knowledge and experience' as well as 'rational inferences that could be drawn from the facts objectively and reasonably viewed in light of the officer's expertise.'" State v. Citarella, 154 N.J. 272, 279 (1998) (quoting State v. Arthur, 149 N.J. 1, 10-11 (1997)). "The fact that purely innocent connotations can be ascribed to a person's actions does not mean that an officer cannot base a finding of reasonable suspicion on those actions as long as 'a reasonable person would find the actions are consistent with guilt.'" Id. at 279-80 (quoting Arthur, supra, 149 N.J. at 11).

Finally, we must remember the "touchstone" for evaluating whether police conduct has violated constitutional protections is "reasonableness." State v. Hathaway, 222 N.J. 453, 476 (2015) (quoting State v. Judge, 275 N.J. Super. 194, 200 (App. Div. 1994)). The reasonableness of police conduct is assessed with regard to circumstances facing the officers, who must make

split second decisions in a fluid situation.  See State v. Bruzzese, 94 N.J. 210, 228 (1983), cert. denied, 465 U.S. 1030, 104 S. Ct. 1295, 79 L. Ed. 2d 695 (1984).

> Such encounters are justified only if the evidence, when interpreted in an objectively reasonable manner, shows that the encounter was preceded by activity that would lead a reasonable police officer to have an articulable suspicion that criminal activity had occurred or would shortly occur.  No mathematical formula exists for deciding whether the totality of circumstances provided the officer with an articulable or particularized suspicion that the individual in question was involved in criminal activity.  Such a determination can be made only through a sensitive appraisal of the circumstances in each case.
>
> [Davis, supra, 104 N.J. at 505 (emphasis added).]

We also note it is important for courts to take a realistic approach to "reviewing police behavior in the context of the ever-increasing violence in society."  State v. Valentine, 134 N.J. 536, 545 (1994) ("As the front line against violence, law-enforcement officers are particularly vulnerable to violence often becoming its victims.").  Guided by these principles, we examine the facts and circumstances presented in this case.

The trial judge listed the culmination of events which, when considered in their totality, formed the troopers' reasonably articulable suspicion of activity placing them in danger.  These include: the troopers were on foot, walking a

dimly lit pathway, and patrolling a very high-crime area at 1 a.m. When Trooper Paligmo observed defendant, he was wearing dark clothing and walking toward him and appeared nervous; rather than look at the troopers, he lowered his head and would not make eye contact. Trooper Paligmo addressed defendant, which he ignored and then placed his hand, which had been at his side, behind his back, reaching into his pocket. At that point, the distance between defendant and the troopers was no more than fifteen feet, a span the trooper's training taught him was critical. Defendant was asked to show his hand, but refused. The troopers acted after they processed probabilities, as guided by their training and direct experience in this neighborhood, along with their assessment of the events, which occurred in a matter of seconds. We conclude, as did the trial judge, the troopers considered their safety to be at great risk because they reasonably believed defendant possessed a weapon and took limited action for their protection.

We reject defendant's argument suggesting the judge erroneously relied on defendant's decision "to ignore the officer's invitation to chat" as justification for the unlawful detention. He maintains his constitutional right to ignore a police field inquiry cannot support a reasonable articulable suspicion justifying an investigative stop. In our view of the

judge's opinion, we determine the mention of defendant's refusal to engage the troopers was contextual only, not determinative.

The pivotal facts changing this encounter from a man walking toward two police officers on a neighborhood street to a situation where police officers became alarmed they faced grave danger by the encounter include defendant's hand movement toward and into his back pocket and his disregard when told to show his concealed hand. Adding these crucial elements, which elapsed over seconds, to Trooper Paligmo's personal knowledge of the numerous violent crimes occurring in the neighborhood, the warnings regarding police safety, the hour of day, the lack of lighting, and the troopers' training and experience, the troopers' fear of exposure to danger was rationally drawn, making Trooper Silipino's stop of defendant not only objectively reasonable, but necessary to assure the troopers' safety. See Coles, supra, 218 N.J. 343-44 ("Case law has recognized law enforcement's need to respond to the fluidity of a street encounter where there is a reasonable suspicion of wrongdoing . . . ."); State v. Pineiro, 181 N.J. 13, 25-27 (2004); Privott, supra, 203 N.J. at 28.

The totality of these facts presented display the troopers' reactions resulted from more than a suspicion or hunch. When viewed together, the facts demonstrate the troopers' perception

14

defendant was likely reaching for a weapon and posed a safety threat was reasonable, which meets <u>Terry</u>'s standard and justifies a stop and frisk. <u>See</u> <u>Michigan v. Long</u>, 463 <u>U.S.</u> 1032, 1049, 103 <u>S. Ct.</u> 3469, 3481, 77 <u>L. Ed.</u> 2d 1201, 1220 (1983) (quoting <u>Terry</u>, <u>supra</u>, 392 <u>U.S.</u> at 21, 88 <u>S. Ct.</u> at 1880, 20 <u>L. Ed.</u> 2d at 906) (stating under the Fourth Amendment, a pat-down or frisk is "permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons").

The reasonableness of the troopers' response to secure defendant's concealed hand is also informed by the Court's opinion in <u>Williams</u>, which held "[u]nder New Jersey's obstruction statute, when a police officer commands a person to stop, or as in this case orders him to place his hands on his head for a pat-down search, that person has no right to take flight or otherwise obstruct the officer in the performance of his duty." <u>Williams</u>, <u>supra</u>, 192 <u>N.J.</u> at 11. The Court found the "defendant was obliged to submit to the investigatory stop, regardless of its constitutionality." <u>Id.</u> at 10.

In this matter, defendant's lack of compliance under the circumstances described would lead a reasonable police officer, or any reasonable person, to perceive an imminent threat to the troopers' safety. State v. Daniels, 393 N.J. Super. 476, 487 (App. Div. 2007). See also Williams, supra, 192 N.J. at 9. See also State v. Otero, 245 N.J. Super. 83, 93 (App. Div. 1990) ("With the occupants' hands hidden, the officer was unable to assess the extent to which his safety was in jeopardy.").

We also reject defendant's argument, which parses individual facts scrutinizing whether defendant's unwillingness to talk to police or the "innocuous" and "nonthreatening" act of concealing his pocketed hand were sufficient to satisfy Terry's standards. State v. Stovall, 170 N.J. 346, 368 (2002) (holding a group of innocent circumstances in the aggregate can support a reasonable suspicion finding). Defendant looks to United States v. Davis, 94 F.3d 1465, 1468 (10th Cir. 1996), as support for his position. The facts here are distinguishable, making the holding in Davis inapposite.

In Davis, the defendant exited a car and walked toward a business known for engaging in criminal and gang activity with his hands in his pocket. Ibid. He ignored a police order to stop. Ibid. The court held "Davis' actions in exiting the car, making and then breaking eye contact with the officers, and then

16                                                           A-1016-14T3

walking away from the officers also d[id] not furnish the basis for a valid <u>Terry</u> stop." <u>Ibid.</u> Further, "[t]he fact that Davis had his hands in his coat pockets on a December night in Tulsa also does not justify an investigative detention." <u>Id.</u> at 1469.

We do not agree the holding in <u>Davis</u> dictates the outcome of this matter. The law requires us to assess all circumstances and make a common sense determination of whether the State showed a reasonable probability defendant's conduct posed a danger to the troopers. <u>Cf.</u> <u>State v. Moore</u>, 181 <u>N.J.</u> 40, 46 (2004) (quoting <u>State v. Zutic</u>, 155 <u>N.J.</u> 103, 113 (1998)) ("Although several factors considered in isolation may not be enough, cumulatively these pieces of information may 'become sufficient to demonstrate probable cause.'"). More importantly, the reasonableness of police reaction is driven by the unique circumstances and renders any analysis case specific. <u>See</u> <u>State v. Dennis</u>, 113 <u>N.J. Super.</u> 292, 296-98 (App. Div.), <u>certif. denied</u>, 58 <u>N.J.</u> 337 (1971).

Unlike the defendant in <u>Davis</u>, who was walking away from police, defendant in this case walked toward police as he moved his hand to his back pocket and continued to conceal his hand, despite requests for him to expose it to the troopers' view. The troopers' safety concerns were supported because defendant

was no more than fifteen feet away when he concealed his hand, preventing the troopers from avoiding direct contact.

Further, the judge found defendant was not stopped merely because he decided not to talk to police while he walked through a high-crime area. He was not stopped merely because he appeared nervous when aware of the police presence or because he dropped his head and avoided eye contact as he continued toward the troopers. Defendant was not stopped when he moved his hand from his side to his back pocket. However, after crediting the training and practical experience of the troopers, whose every day work transpires on these streets, defendant's refusal to show his concealed hand led to the reasonable belief he possessed a weapon and posed a threat. Bruzzese, supra, 94 N.J. at 228. See Otero, supra, 245 N.J. Super. at 93 ("When the occupants [of a motor vehicle] refused to expose their hands, justification arose for taking the 'stop and frisk' steps required to ensure the officer's safety."). Even if several factors viewed in isolation may not be enough, cumulatively all of these pieces of information are sufficient to meet the State's burden to validate a Terry stop. Stovall, supra, 170 N.J. at 368.

Once an officer has a basis to make a lawful investigatory stop, he may protect himself during that stop by conducting a

search for weapons if he "has reason to believe that the suspect is armed and dangerous." Adams v. Williams, 407 U.S. 143, 146, 92 S. Ct. 1921, 1923, 32 L. Ed. 2d 612, 617 (1972) ("So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose."). Here, for their protection, troopers had a right to disarm defendant, using a limited protective frisk of his back pocket. "The test is not whether there were other reasonable or even better ways to execute the search, for hindsight and considered reflection often permit more inspired after-the-fact decision-making." Watts, supra, 223 N.J. at 514. "[T]hose who must act in the heat of the moment do so without the luxury of time for calm reflection or sustained deliberation." Hathaway, supra, 222 N.J. at 469 (quoting State v. Frankel, 179 N.J. 586, 599, certif. denied, 543 U.S. 876, 125 S. Ct. 108, 160 L. Ed. 2d 128 (2004)). We must not examine the facts distorted by hindsight, but "examine the conduct of those officials in light of what was reasonable under the fast-breaking and potentially life-threatening circumstances that were faced at the time." Ibid. (quoting Frankel, supra, 179 N.J. at 599). "For purposes of our Federal and State Constitutions, it is enough that the

police officers, in performing their duties, acted in an objectively reasonable fashion." Watts, supra, 223 N.J. at 515.

The search and seizure was objectively reasonable. As a result, suppression was properly denied.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1016-14T3