**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0182-18T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

WILKINSON A. REYES,

     Defendant-Appellant.

_____

Submitted January 6, 2020 – Decided March 20, 2020

Before Judges Vernoia and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 17-02-0114.

Joseph E. Krakora, Public Defender, attorney for appellant (Alicia J. Hubbard, Assistant Deputy Public Defender, of counsel and on the brief).

Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney for respondent (Timothy M. Ortolani, Special Deputy Attorney General/Acting Union County Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant, Wilkinson A. Reyes, appeals from his conviction by guilty plea to simple possession of heroin, contrary to N.J.S.A. 2C:35-10(a). The sole issue on appeal is whether the trial court erred when it denied defendant's motion to suppress controlled substances found on his person. Defendant was arrested and subjected to a search incident to that arrest after a fold of heroin fell into view while police were conducting a "Terry"[1] frisk for weapons. Defendant contends the initial stop and ensuing frisk were unlawful.

We have reviewed the record in view of the parties' arguments and applicable legal principles and conclude that the heroin should have been suppressed. The police officers were authorized to initiate an investigative detention based on reasonable suspicion that defendant was involved in criminal activity. However, the State failed to establish that the officers had reasonable suspicion to believe defendant was armed with a weapon. The protective pat-down search, therefore, was unlawful. Because the pat down led to the discovery of the heroin, that evidence should have been suppressed as a fruit of the unlawful frisk.

---

[1] Terry v. Ohio, 392 U.S. 1 (1968).

A-0182-18T2

## I.

A Union County Grand Jury indicted defendant for possession of heroin, contrary to N.J.S.A. 2C:35-10(a)(1), and possession of that heroin with intent to distribute, contrary to N.J.S.A. 2C:35-5(a)(1), (b)(3). Defendant filed a motion to suppress arguing that the police did not have a lawful basis to initiate an investigative detention or to conduct a protective frisk for weapons. The trial judge convened an evidentiary hearing after which he denied defendant's suppression motion in a written opinion.

Thereafter, defendant pled guilty to simple possession of heroin pursuant to a negotiated agreement in which the State agreed to dismiss the possession-with-intent-to-distribute charge. Defendant was sentenced in accordance with the plea agreement to noncustodial probation for a period of eighteen months to be followed by 180 days incarceration in county jail. The court made defendant's service of the jail term contingent on his performance on probation. If defendant performed well on probation, the judge indicated he would vacate the custodial portion of the sentence.

Defendant appealed the denial of his suppression motion pursuant to Rule 3:5-7(d).

A-0182-18T2

II.

Defendant raises the following contentions for our consideration:

THERE WAS NO REASONABLE SUSPICION TO STOP [DEFENDANT], NOR PROBABLE CAUSE TO CONDUCT THE SUBSEQUENT WARRANTLESS SEARCH OF HIS PERSON. THEREFORE, THE EVIDENCE OF THE SEARCH MUST BE SUPPRESSED.

A. THE ENCOUNTER WAS AN UNLAWFUL INVESTIGATIVE STOP NOT PREDICATED UPON REASONABLE SUSPICION.

B. WHETHER OR NOT THE POLICE HAD REASONABLE SUSPICION TO STOP [DEFENDANT], THERE WAS NO PROBABLE CAUSE TO JUSTIFY THE SEARCH AND NO EXCEPTION TO THE REQUIREMENT FOR A WARRANT AND/OR PROBABLE CAUSE.

III.

The following facts were adduced at the suppression hearing. On October 25, 2016, at approximately 8:45 p.m., two detectives and another officer were in an unmarked police vehicle on patrol in the area of East Sixth Street in Plainfield. Detective Stephon Knox testified that the neighborhood was a high-crime area with frequent drug activity. He noted that "[a] few days prior," there were "shootings throughout the City of Plainfield." As a result of those

shootings, officers were on high-visibility patrol and had instructions to investigate all suspicious behavior.

The officers observed five adult males sitting on the steps in front a building on East Sixth Street. The men appeared to be talking to one another; they were not drinking or otherwise engaging in disruptive activity. When the police vehicle approached, one of the males walked away quickly. Although that caught the officers' attention, they did not pursue the individual who walked away.

Detective Knox testified that it is common for individuals to sit on other persons' property to ingest or sell controlled substances. The detective acknowledged, however, that in this instance, he did not observe anyone using drugs, nor did he observe any hand-to-hand drug transactions.

The officers drove up to the four remaining males and, while remaining in the police vehicle, asked them if they lived there. Defendant answered "no" but told the officers that a female who lives in the building said they could sit on the steps. Defendant was not able to provide the name of the woman who he claimed had given them permission to be on the property.

The building is a multi-family dwelling with two separate front doors. The officers got out of the police vehicle to investigate whether the males had

5

permission to be sitting on the front steps. The officers knocked on both doors. No one answered the door on the left, but a woman answered the door on the right. She stated she did not know the men sitting on the front steps and had not given them permission to be there.

Now believing that defendant had lied to them, the officers escorted defendant and the other three males to the police vehicle. Defendant at that point became "extremely nervous." Detective Knox testified that defendant's hands were shaking and he started breathing faster. Knox acknowledged that, from his experience, it is common for people to become nervous around police even if they have done nothing wrong. Based on defendant's nervousness, the detective conducted a protective frisk.

As the detective was patting down defendant's outer clothing, he felt a cardboard box. He asked defendant what it was and defendant answered that it was just cigarettes. The detective did not remove the box from defendant's pocket.

During the frisk, defendant was leaning on the car. Knox repeatedly asked defendant to stop doing so. The detective testified that based on his experience, people who lean on a car during a frisk are trying to hide contraband. The detective continued the frisk. When he reached defendant's waist area, a small

6

glassine package, commonly referred to as a "fold," fell to the ground. Knox testified that the fold had fallen from the front of defendant's jacket. Knox recognized the fold to be heroin. A subsequent search incident to defendant's arrest uncovered two cigarette boxes, one of which contained a paper packet with glassine folds inside of it.

IV.

We begin our analysis by acknowledging general legal principles that govern this appeal. When reviewing a trial court's decision in a motion to suppress, we defer to the court's factual findings so long as they are "supported by sufficient credible evidence in the record." State v. Gamble, 218 N.J. 412, 424 (2014) (citing State v. Elders, 192 N.J. 224, 243 (2007)). "By contrast, the task of appellate courts generally is limited to reviewing issues of law. Because legal issues do not implicate the fact-finding expertise of the trial courts, appellate courts construe the Constitution, statutes, and common law 'de novo – "with fresh eyes" . . . .'" State v. S.S., 229 N.J. 360, 380 (2017) (emphasis omitted) (quoting State v. Morrison, 227 N.J. 295, 308 (2016)). We need not defer, in other words, to a trial court judge's interpretive conclusions "unless persuaded by their reasoning." Morrison, 227 N.J. at 308 (citing State v. Goodwin, 224 N.J. 102, 110 (2016)).

## A. Initial Field Inquiry

When analyzing an alleged Fourth Amendment violation and its state constitutional counterpart, Article 1, Paragraph 7 of the New Jersey Constitution, we proceed step by step through the sequence of events leading to the discovery of the challenged evidence. We begin by reviewing the earliest stages of this police-citizen encounter to determine precisely when the officers first initiated an investigative detention, which requires objective grounds for suspicion.

We agree with the trial court that the officers acted reasonably when they approached the men on the front steps. As the trial court correctly noted, police are permitted under the consensual field inquiry doctrine to approach people and ask questions without any grounds for suspicion, provided those individuals would reasonably believe that they are free to walk away or ignore police questions. State v. Pineiro, 181 N.J. 13, 20 (2004) (citing State v. Maryland, 167 N.J. 471, 483 (2001)). In this instance, the officers posed their questions to defendant in a conversational manner that was "not harassing, overbearing, or accusatory in nature." State v. Nishina, 175 N.J. 502, 510 (2003). The fact that one of the individuals walked away without repercussion supports the

8

conclusion that the initial conversation occurred within the bounds of a lawful field inquiry.

We also agree with the trial court that the officers were permitted to knock on the front doors of the two residences to investigate defendant's claim that he and the other individuals had permission to sit on the front steps. That investigative technique did not intrude upon defendant's Fourth Amendment liberty or privacy rights and thus could be undertaken without objective grounds for suspicion.

## B. Escalation to Investigatory Stop

The field inquiry escalated to an investigative detention, commonly referred to as a Terry "stop," when police "escorted" defendant and the others to the nearby police vehicle. See State v. Rosario, 229 N.J. 263, 267 (2017) (holding that the defendant was subjected to investigative detention, not just a field inquiry, because "a reasonable person would feel the constraints on her freedom of movement from having become the focus of law enforcement attention"). There is no indication in the record before us that defendant or the others were afforded the option to refuse the police instruction that they move from the steps to the police car. Nor would defendant have reasonably believed at this point that he could simply walk away.

A-0182-18T2

At the moment of escalation from field inquiry to investigative detention the officers needed to have reasonable articulable suspicion to believe defendant was involved in criminal activity. See Pineiro, 181 N.J. at 20 ("An investigatory stop . . . is valid 'if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity.'" (quoting Nishina, 175 N.J. at 510–11)). Stated in another way, there must be "some objective manifestation that the person [detained] is, or is about to be engaged in criminal activity." Id. at 22 (alteration in original) (quoting United States v. Cortez, 449 U.S. 411, 417–18 (1981)).

A determination of reasonable suspicion for an investigatory stop is highly fact-sensitive. Nishina, 175 N.J. at 511 (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)). We consider the "totality of the circumstances" in assessing whether police have reasonable, articulable suspicion that criminal activity is afoot. State v. Davis, 104 N.J. 490, 504 (1986). In this instance, the State presented three circumstances from which to adduce reasonable suspicion to initiate a stop: (1) the high crime nature of the neighborhood, (2) the detective's experience that it is common in these neighborhoods for drug offenders to sit on someone else's property, and (3) the apparent lie defendant told police concerning his authority to be sitting on another person's front steps. To

facilitate our analysis, we address the pertinent suspicion factors separately before measuring their combined effect. See Nishina, 175 N.J. at 511 ("Facts that might seem innocent when viewed in isolation can sustain a finding of reasonable suspicion when considered in the aggregate, so long as the officer maintains an objectively reasonable belief that the collective circumstances are consistent with criminal conduct." (citations omitted)).

We first consider the significance of the fact this encounter occurred in a high-crime neighborhood. Our search and seizure jurisprudence has long recognized that the high crime, high violence nature of a neighborhood is a relevant circumstance police may take into account in deciding whether to initiate a stop and, thereafter, whether to conduct a protective frisk for weapons. While this circumstance by itself is not sufficient to justify either a stop or a frisk, it often is cited as a suspicion factor when combined with other more individualized suspicious circumstances. See, e.g., State v. Bard, 445 N.J. Super. 145, 157–58 (App. Div. 2016) (relying in part on defendant's presence in a high-crime area in holding that police possessed a reasonable, articulable suspicion of criminal activity).

In ascertaining the weight police may ascribe to the nature of the surrounding area in determining whether reasonable suspicion exists, we must

be mindful of the constitutional rights of law-abiding citizens who live, work, and attend school in high-crime neighborhoods. This circumstance applies to countless New Jersey residents, especially those who live in urban centers. Reviewing courts applying this suspicion factor to real-world police decisions, therefore, must guard against treating it as a talisman before which Fourth Amendment rights are diminished.

The detective's testimony concerning the recent shootings in Plainfield would not, on its own, justify detaining defendant. While the shootings a "few days" before the police-citizen encounter certainly supported the enhanced vigilance of the police department, those shootings did not provide sufficient grounds to stop defendant in the absence of reason to believe he had been connected to those incidents See State v. Kuhn, 213 N.J. Super. 275, 281 (App. Div. 1986) (noting that a report of a day-old burglary "does not transform a residential neighborhood into a no-man's land in which any passerby is fair game for roving police interrogatories" (quoting In re Tony C., 582 P.2d 957, 962 (Cal. 1978))).

We turn next to the detective's experience that drug users and sellers in this neighborhood often sit on another person's property to ingest drugs or engage in illicit drug transactions. The detective's experience with respect to

the common methods of operation and practices of drug offenders is a relevant circumstance that provides a context in which to interpret defendant's conduct. See State v. Gibson, 318 N.J. Super. 1, 8 (App. Div. 1999) ("In deciding the validity of an investigatory stop, the evaluating court must 'give weight to "the officer's knowledge and experience" as well as "rational inferences that could be drawn from the facts objectively and reasonable viewed in light of the officer's expertise."'" (quoting State v. Citarella, 154 N.J. 272, 278 (1998))).

Detective Knox acknowledged that he did not observe defendant or the other men sitting on the steps openly engaging in criminal activity. The police also were not responding to a report that these individuals were committing an offense. Viewed in isolation, therefore, the detective's experience as to the common practices of drug offenders in this high-crime neighborhood would be insufficient to justify a stop.

However, the detective's experience takes on added significance when we consider defendant's statement to the officers that he and the other persons sitting on the front steps had received permission to do so from a woman inside the house. That brings us to the one suspicion factor relied on by the State that relates to defendant's own conduct (an individualized suspicion factor), as distinct from the conduct of others (generalized suspicion factors). Defendant's

13                                                          A-0182-18T2

statement to the officers that he had express permission to sit on the steps of the building, considered in light of the follow-up investigation and the detective's experience, tips the scale in favor of reasonable suspicion to believe criminal activity was afoot.

Specifically, the officers' follow-up investigation failed to verify defendant's answer to the simple question posed during the field-inquiry segment of this encounter. It was reasonable in these circumstances for detective Knox to infer that defendant had lied. It is significant, moreover, that the suspected lie relates to the detective's experience as to the common behavior of local drug offenders. Viewed through the lens of that experience, it was reasonable for Detective Knox to infer that defendant lied for the purpose of concealing criminal activity.

We recognize that the officers only spoke to an occupant from one of the two housing units. It therefore is possible that permission to sit on the steps had been granted by an occupant of the other housing unit. However, the reasonable-suspicion standard needed to justify an investigative detention is not overly demanding. See Nishina, 175 N.J. at 511 (describing reasonable suspicion as requiring "some minimal level of objective justification" (quoting Sokolow, 290 U.S. at 7)). Certainly, the officers did not have to possess probable cause to

14

believe defendant had lied to them in order to justify the investigative detention. Id. at 514 (reiterating that reasonable suspicion, not probable cause, is the standard for an investigative detention).

Applying the less exacting reasonable suspicion level of proof to the circumstances presented in this case, we agree with the trial court that the officers had a reasonable basis to suspect that defendant had lied to them. See State v. Daniels, 264 N.J. Super. 161, 166 (App. Div. 1993) (recognizing that lying to police is a relevant factor in determining whether police have reasonable suspicion to believe criminal activity is occurring (citing State v. Lund, 119 N.J. 35, 48 (1990))).

Considering the totality of the suspicious circumstances, we agree with the trial court that the detective had an objectively reasonable basis to believe that defendant and the other men were engaged or about to be engaged in criminal activity. Accordingly, it was lawful for the officers to direct defendant and the others to move off the steps and toward the police car where the officers could continue their investigation pursuant to Terry.

C. Authority to Frisk for Weapons

We next address whether the officers in this case were permitted to frisk defendant for weapons. We note that the trial court's written opinion merely

15

acknowledges that a pat down occurred. It does not address whether the legal standard for conducting a frisk was satisfied. We therefore review the record de novo to determine if that standard was met.

The facts that support a lawful stop do not always support a lawful frisk. See State v. Thomas, 110 N.J. 673, 683–85 (1988) (concluding that although the officer was justified in conducting an investigative detention, the record did not justify the officer conducting a pat-down search of the defendant); see also State v. Walker, 282 N.J. Super. 111, 115 (App. Div. 1995) (holding that a "generalized suspicion" that "something was amiss" during a valid traffic stop did not provide a reasonable basis for belief that defendant might be armed and dangerous). Rather, the frisk is a separate and distinct Fourth Amendment intrusion that must be based on an individualized suspicion that the suspect is carrying a concealed weapon. Police are afforded the "automatic authority" to conduct a frisk only when a stop is based on a suspected offense that involves violence or weapons. Thomas, 110 N.J. at 680.

In the case before us, as in Thomas, the circumstances that justified the initial stop do not reasonably suggest that defendant was armed. As we have already noted, although Detective Knox testified there had been shootings at unspecified locations in the City of Plainfield a few days earlier, there is nothing

in the record to link defendant to those incidents. So far as our review of the record shows, at the moment the field inquiry escalated to an investigative detention, there was no objective basis to believe defendant was carrying a weapon.

In State v. Garland, we held that if there is no objective basis to believe a suspect is armed and dangerous based on an initial stop, a frisk is not permitted unless some event occurs between the stop and frisk. 270 N.J. Super. 31, 42 (App. Div. 1994). In this case, an additional suspicion factor did arise after police escorted defendant to the police car but before they initiated the pat down. Specifically, defendant became "extremely nervous" as evidenced by trembling hands and rapid breathing.[2] The record shows, moreover, that defendant's nervousness was a critical factor in the detective's decision to conduct a frisk. Detective Knox testified that he became apprehensive when defendant became nervous.

Detective Knox acknowledged that, from his experience, it is common for people to become nervous around police even if they have done nothing wrong. That acknowledgment does not minimize the significance of defendant's nervous

_____

[2] Defendant's nervous reaction occurred only after he was directed to move toward the police vehicle and thus cannot be used to justify the decision to initiate the investigatory stop.

A-0182-18T2

reaction to the investigatory stop. In State v. Stovall, 170 N.J. 346, 367 (2002), the Supreme Court remarked that while "some individuals become nervous when questioned by a police officer[,] . . . the fact that such reactions may be commonplace does not detract from the well-established rule that a suspect's nervousness plays a role in determining whether reasonable suspicion exists."

The timing of defendant's nervous reaction is significant. Defendant did not exhibit indications of extreme nervousness at the outset of the encounter or when the detective first posed a question to him. Rather, defendant's hands trembled and he started to breath fast only after police had conducted a follow-up investigation with the house occupant and after police instructed defendant and the others to walk towards the police vehicle. We therefore consider it reasonable to infer that defendant's sudden nervousness reflects a consciousness of guilt and not just general apprehension while around police.

That conclusion does not necessarily mean that such nervousness automatically constitutes reasonable suspicion that defendant was armed and dangerous. In State v. Carty, the Court held that nervousness is "not sufficient grounds for the reasonable and articulable suspicion necessary to expand the scope of a detention beyond the reason for the original stop." 170 N.J. 632, 648

(2002); see also Pineiro, 181 N.J. at 29 (noting the suspect's nervousness did not elevate reasonable suspicion to probable cause).

Our decision in Walker is instructive on this point. In that case, the defendant during a motor vehicle encounter with a state trooper "appeared nervous, spoke very quickly, stuttered, and failed to make eye contact." Walker, 282 N.J. Super. at 113. The defendant and the driver of the stopped vehicle also gave conflicting answers. Ibid. We concluded on those facts that the trooper did not have a particularized suspicion that the defendant was armed. We reasoned, "[a]lthough the driver's [nervous] demeanor and the responses that the driver and defendant gave to the officer's questions may have created a reasonable suspicion that they were engaged in some form of wrongdoing, such as being in possession of illegal drugs, they did not provide a reasonable basis for a belief that defendant might be armed and dangerous." Id. at 115. Here too, defendant's nervousness, coupled with his apparent lie, bolsters the suspicion that he was engaged in some form of wrongdoing, such as a drug offense consistent with Detective Knox's experience with respect to persons who sit on someone else's front steps. Defendant's nervousness, however, does not reasonably suggest that he was carrying a weapon.

Furthermore, in assessing the totality of the circumstances, we take note of the weapons-related suspicion factors recognized in our case law that were not present in this encounter. See State v. Richards, 351 N.J. Super. 289, 307 (App. Div. 2002) (highlighting suspicion factors not present in that case and noting "what this record does not show is more persuasive than what it does reveal").

For example, the officers did not observe an unexplained bulge in defendant's clothing that might have been a weapon. Ibid. Defendant made no threatening or furtive movement such as reaching to his waistband or pocket.[3] Ibid.; see also State v. Privott, 203 N.J. 16, 29–30 (2010) (noting the suspect's movement of one hand toward his waistband—an area commonly used by armed persons to conceal a weapon—was part of the totality of the circumstances that would lead an officer to have objectively reasonable concern for his or her

---

[3] Defendant's action of leaning against the police vehicle despite being instructed not to do so might be interpreted either as resistance or furtive conduct somewhat analogous to reaching toward a pocket. While less threatening than reaching for a concealed weapon, pressing against the vehicle would make it more difficult for the officer to pat down the front of a suspect's clothing to detect the presence of a weapon. This behavior undermines the protective value of the frisk and thus enhances the danger to officer safety. However, defendant's non-compliance with the detective's instructions occurred after the frisk was initiated. Therefore, defendant's apparent attempt to frustrate the frisk cannot be considered a suspicion factor justifying the pat down.

safety); State v. Bellamy, 260 N.J. Super. 449, 457 (App. Div. 1992) (finding a motorist's movement toward the inside jacket pocket constituted reasonable suspicion to justify frisk even though it was equally likely that he was merely reaching for credentials).

Furthermore, the officers did not recognize defendant from prior encounters and had no reason to believe defendant was a member of a violent street gang. Privott, 203 N.J. at 28 (noting that an officer's knowledge that defendant was associated with a violent street gang is a relevant circumstance supporting a Terry stop and frisk). Nor did the officers have reason to believe defendant had a criminal record or history of violence or possession of weapons. C.f. State v. Valentine, 134 N.J. 536, 547 (1994) (deeming an officer's knowledge of the suspect's prior armed robbery offense relevant but not sufficient on its own to justify a frisk). The officers, moreover, were not responding to a report that defendant was seen in possession of a weapon. C.f. Florida v. J.L., 529 U.S. 266 (2000) (holding that an anonymous report of a man with a gun does not per se justify a stop and frisk). Nor were the officers responding to a recent specific violent or weapons-related crime in the area that might have been committed by defendant or the other men who had been sitting on the front steps. As we have already noted, the shootings in Plainfield

21

occurred several days before this encounter and the officers had no objective basis to link defendant to those incidents.

We appreciate that reviewing courts should be circumspect in second-guessing police regarding their concern for safety. Officers on patrol, after all, "must often act on the spur of the moment without the opportunity for abstract contemplation that . . . judges enjoy." State v. Bynum, 259 N.J. Super. 417, 421–22 (App. Div. 1992).

Nonetheless, on the record before us, we do not believe defendant's nervous reaction, when considered in combination with the suspicion factors that justified the stop, was sufficient to establish reasonable suspicion to believe he was carrying a concealed weapon. We therefore are constrained on these facts to hold that the frisk was unlawful. Because the heroin was found only after and as a direct result of the unlawful frisk, that evidence must be suppressed. See State v. Bryant, 227 N.J. 60, 75 (2016) (holding evidence from an illegal protective sweep must be suppressed as "fruits of the poisonous tree").

The order denying the motion to suppress is reversed and the matter is remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

22                                                          A-0182-18T2