**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0099-25

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

NICHOLAS S. MARRUCCA
and LIAM S. CLARK,

    Defendants-Respondents.

_____

Argued January 6, 2026 – Decided March 6, 2026

Before Judges Gooden Brown and Rose.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 24-08-1388.

William Kyle Meighan, Supervising Assistant Prosecutor, argued the cause for appellant (Bradley D. Billhimer, Ocean County Prosecutor, attorney; Samuel Marzarella, Chief Appellate Attorney, of counsel; William Kyle Meighan, on the briefs).

Zachary G. Markarian, Assistant Deputy Public Defender, argued the cause for respondent Nicholas S. Marrucca (Jennifer N. Sellitti, Public Defender,

attorney; Zachary G. Markarian, of counsel and on the brief).

Patricia Colligan, Designated Counsel, argued the cause for respondent Liam S. Clark (Jennifer N. Sellitti, Public Defender, attorney; Patricia Colligan, on the brief).

PER CURIAM

We granted the State leave to appeal from a July 23, 2025 Law Division order suppressing evidence seized pursuant to a warrantless stop of a white Nissan car occupied by defendants Nicholas S. Marrucca and Liam S. Clark on April 13, 2023, in Jackson Township. The State argues the motion court misapplied our Supreme Court's holding in State v. Smart, 253 N.J. 156 (2023), and erroneously found the circumstances giving rise to probable cause to search the car were "foreseeable," thereby "effectively eliminating" our State's automobile exception to the warrant requirement. For the following reasons, we reverse and remand for further proceedings.

I.

We summarize the pertinent facts and events from the motion record. In August 2024, Marrucca and Clark were charged in a twenty-two-count Ocean County indictment with various offenses emanating from the April 13, 2023

2

incident.[1]  Marrucca thereafter moved to suppress the evidence seized from the warrantless search of the car and Clark joined the motion.

During the one-day evidentiary hearing, Detectives Eric Fricks and Derek Thomason of the Jackson Township Police Department's (JTPD) Special Enforcement Unit (SEU) testified on behalf of the State.  The footage from Thomason's body worn camera (BWC) depicting the automobile stop and warrantless search was played during the prosecutor's direct examination of Thomason.  Defendants did not testify or present any evidence.

---

[1]  Defendants were jointly charged with:  two counts of third-degree possession of a controlled dangerous substance (CDS), N.J.S.A. 2C:35-10(a)(1); one count of third-degree possession with intent to distribute cocaine, N.J.S.A. 2C:35-5(a)(1) and (b)(3); one count of third-degree possession with intent to distribute fentanyl, N.J.S.A. 2C:35-5(a)(1) and (b)(5); two counts of second-degree unlawful possession of a firearm, N.J.S.A. 2C:39-5(b)(1); two counts of second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a); two counts of fourth-degree unlawful possession of a knife, N.J.S.A. 2C:39-5(d); two counts of third-degree possession of a knife for an unlawful purpose, N.J.S.A. 2C:39-4(d); two counts of second-degree possession of a firearm while engaged in certain drug activity, N.J.S.A. 2C:39-4.1(a); fourth-degree possession of hollow nose bullets, N.J.S.A. 2C:39-3(f); fourth-degree possession of a large capacity ammunition magazine, N.J.S.A. 2C:39-3(j); and third-degree receiving stolen property, N.J.S.A. 2C:20-7.  Marrucca was separately charged with two counts of second-degree certain person not to possess a firearm, N.J.S.A. 2C:39-7(b)(1), and two counts of fourth-degree certain person not to possess a weapon, N.J.S.A. 2C:39-7(a).  Clark was separately charged with fourth-degree possession of a false identifying document.  N.J.S.A. 2C:21-2.1(d).

A-0099-25

The detectives' testimony, credited by the motion court, was largely consistent and overlapping. At the time of the incident, both detectives and their supervisor, Detective Sergeant Steven Cilento, were assigned to the three-member SEU, a "plainclothes narcotics unit primarily focused on narcotics investigations and quality of life issues within Jackson Township."

Between 6:20 p.m. and 6:30 p.m., while the detectives were in their office performing administrative tasks, a concerned citizen sent an unprompted text message to Thomason's work cell phone. In the message, the citizen alerted police to "suspicious activity" and "heavy foot traffic in the area" of XXX Owls Nest Court in Jackson Township, but did not identify any individuals or vehicles. The concerned citizen, who had provided Thomason information in the past, wished to remain anonymous.

In response to the tip, Cilento, Thomason, and Fricks "promptly responded to the area" – arriving around 6:45 p.m. – and conducted surveillance from different vantage points. Police were familiar with both residents of XXX Owls Nest Court from prior investigations. Fricks described Daniel Meadows[2] as a

_____

[2] In its merits brief the State notes, in February 2025, Meadows was sentenced to a probationary term following his guilty plea to third-degree possession of CDS with intent to distribute. Meadows did not participate in the suppression motion and is not a party to this appeal.

A-0099-25

"typical drug purchaser and user," and said the female resident, who died prior to the hearing, used and distributed narcotics. Fricks confirmed police had "no active investigations for the residents at th[at] time."

Sometime after 7:00 p.m., Thomason saw Meadows walk from his home. At some point, Thomason lost visual contact with Meadows, but Fricks saw Meadows walk directly toward an ice cream truck and two white vehicles parked on Eucalyptus Court. From his vantage point about thirty yards away, Fricks saw "multiple individuals . . . congregated in that area."

Meadows approached the area and spoke with a few individuals, including "a skinny black male with short dreadlocks," later identified as Kwalsky Narcisse,[3] who then "got into the passenger seat of one of the white vehicles." Meadows stood outside the car, whose door was open, "and [Fricks] saw him hunch over and lean into the car" and engage in a "hand-to-hand transaction" with Narcisse. Meadows then walked in Fricks's direction "with his hand . . . in his pocket" as though he were "clenching a small item." As Meadows walked toward Fricks, Meadows removed the small item from his pocket,

---

[3] According to the State, in June 2024, Narcisse pled guilty to certain persons not to possess a handgun. He was awaiting sentencing when the State filed its September 25, 2025 merits brief. Narcisse did not participate in the suppression motion and is not a party to this appeal.

A-0099-25

"manipulat[ed] it through his fingers," and threw the object "in the air like a dice [sic]." Fricks testified he "immediately identif[ied] that it was a bundle of wax folds of suspected heroin." Fricks radioed Thomason and disclosed his observations. Fricks then lost sight of Meadows.

Thomason testified, from his surveillance position, he could not observe the transaction between Meadows and Narcisse. But Thomason saw Meadows "crossing the street towards Owls Nest Court" holding "a quantity of [suspected] heroin in his hands." Shortly thereafter, Meadows was arrested. Although Meadows voluntarily waived his Miranda[4] rights, he "would not divulge any assistance or intelligence towards the investigation." According to Thomason, after Meadows was arrested, Cilento and Fricks returned to their surveillance positions "to maintain visual [sic] on the suspect vehicle," from which police believed heroin was distributed to Meadows.

Fricks testified, after Meadows was arrested, marked patrol units responded and stopped both vehicles parked near the ice cream truck.[5] When he approached the car parked near Eucalyptus Court, Fricks recognized the front

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

[5] The other car, also a white Nissan, was searched by consent, but no contraband was found. The occupants of that car are not part of this case.

A-0099-25

seat passenger as "the black skinny male with the short dreadlocks" who "did the hand-to-hand transaction with Meadows." Noting the timestamp on his BWC footage, Thomason testified Narcisse was placed under arrest at 7:52 p.m., "based on the totality of the circumstances and the investigation, for conspiracy to distribute CDS." Police also arrested Marrucca, the driver of the Nissan, and Clark, the rear seat passenger. Prior to the incident date, police were unfamiliar with the car and all three occupants.

Fricks testified when police removed all three occupants from the car, he saw "a backpack on the front passenger floorboard where [Narcisse] was seated." A search incident to Narcisse's arrest revealed United States currency in multiple denominations. During the stop, Marrucca volunteered the backpack in the vehicle did not belong to him.

Shortly thereafter, around 8:04 p.m., police conducted a warrantless search of the car. During the search, police found two loaded handguns, folding knives, suspected cocaine, digital scales, and United States currency. Police also found "within the backpack," wax folds of suspected heroin or fentanyl, bearing the same stamps as the narcotics recovered from Meadows.

Immediately following closing arguments, the motion court issued an oral decision, granting defendants' motion. The court initially noted defendants did

A-0099-25

not challenge the stop, but remarked had they done so, the "[c]ourt would have had no hesitation in finding there was reasonable, articulable suspicion to affect that motor vehicle stop."

Turning to the warrantless search of the car, the motion court chronicled the development of federal and New Jersey law concerning the automobile exception, including our Supreme Court's decisions in State v. Witt, 223 N.J. 409 (2015), and Smart. The court recognized the Witt Court authorized warrantless automobile searches when: "(1) the police have probable cause to believe the vehicle contains evidence of a criminal offense; and (2) the circumstances giving rise to probable cause are both unforeseeable and spontaneous." Quoting Smart, 253 N.J. at 173, the court further observed, the Supreme Court "'emphasize[d] . . . the question of whether the circumstances giving rise to probable cause were unforeseeable and spontaneous is a fact-sensitive inquiry that should be analyzed case by case,' by the trial judge." The court found the circumstances in the present matter fell "somewhere in between" those in Witt and Smart.

Rhetorically questioning whether the spontaneous and unforeseeable test must occur before police "leave headquarters," the court found the detectives' response to the concerned citizen's tip was "[t]o some extent . . . spontaneous"

A-0099-25

and, because the tip was "so vague," "at that point it was unforeseeable what was to occur."

Detailing the timeline of events that followed, the motion court distinguished the circumstances in Smart, finding "[t]he difference here is the police had probable cause before they even pulled over the white Nissan." The court found "the spontaneity and unforeseeability ended at the latest when Meadows was arrested, found in possession of these wax folds, the hand-to-hand [transaction] was confirmed, and the officer articulated credibly that he believed the white Nissan had distributed the heroin." The court concluded: "At that point, however, the law requires him to then secure that vehicle, the occupants, impound it, . . . and get a warrant, whether it be a telephonic or a traditional warrant."

## II.

Generally, our review of a trial court's decision on a suppression motion is circumscribed and deferential following a testimonial hearing. See State v. Fenimore, 261 N.J. 364, 372-73 (2025) (reiterating appellate courts defer to a trial court's factual findings when they "are supported by sufficient credible evidence in the record"(quoting State v. Elders, 192 N.J. 224, 243 (2007))). "A trial court's legal conclusions, 'however, and the consequences that flow from

A-0099-25

established facts,' are reviewed de novo." State v. Bullock, 253 N.J. 512, 532 (2023) (quoting State v. Hubbard, 222 N.J. 249, 263 (2015)).

Well-settled principles guide our review. The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution protect against "unreasonable searches and seizures" and generally require a warrant issued upon "probable cause." U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. "[A] warrantless search is presumptively invalid" unless the State establishes the search falls into "one of the 'few specifically established and well-delineated exceptions to the warrant requirement.'" State v. Edmonds, 211 N.J. 117, 130 (2012) (quoting State v. Frankel, 179 N.J. 586, 598 (2004)).

When a defendant moves to suppress evidence seized without a warrant, the State bears the "burden, by a preponderance of the evidence, to establish" an exception to the warrant requirement applies and that "the warrantless search or seizure of an individual was justified in light of the totality of the circumstances." State v. Bard, 445 N.J. Super. 145, 155-56 (App. Div. 2016) (citing Illinois v. Gates, 462 U.S. 213, 238 (1983)). "[T]he 'touchstone' for evaluating whether police conduct has violated constitutional protections is 'reasonableness.'" Id. at 157 (quoting State v. Hathaway, 222 N.J. 453, 476 (2015)). "The reasonableness of police conduct is assessed with regard to

circumstances facing the officers, who must make split second decisions in a fluid situation." Ibid.

To conduct a search under the automobile exception to the warrant requirement, the State must satisfy the test set forth in Witt, 223 N.J. at 446-48, "pro[of] that probable cause to believe the vehicle contains contraband or other evidence of unlawful activity arose spontaneously and unforeseeably." State v. Courtney, 478 N.J. Super. 81, 93 (App. Div. 2024) (citing Witt, 223 N.J. at 446-48). The requirements of unforeseeability and spontaneity ensure police "could not sit on probable cause and later conduct a warrantless search, for then the inherent mobility of the vehicle would have no connection with a police officer not procuring a warrant." Witt, 223 N.J. at 431-32. Thus, "police officers who possess probable cause well in advance of an automobile search should get a warrant." Smart, 253 N.J. at 174 (citing Witt, 223 N.J. at 431).

"[W]hether the circumstances giving rise to probable cause were unforeseeable and spontaneous is a fact-sensitive inquiry that should be analyzed case by case." Id. at 173. "Probable cause is a well-grounded suspicion that a criminal offense has been or is being committed." State v. Hammer, 346 N.J. Super. 359, 366 (App. Div. 2001); see also State v. Burnett, 42 N.J. 377, 387 (1964). "Whether probable cause existed is to be determined by the

11

objective reasonableness standard." State v. Judge, 275 N.J. Super. 194, 201 (App. Div. 1994).

In Smart, police stopped a GMC vehicle "two months" after "a concerned citizen . . . connected a particular residence – and a vehicle like the GMC – with drug deals." 253 N.J. at 172. The following month, a confidential informant (CI) told police the defendant "previously utilized the GMC for drug distribution." Ibid. Prior to stopping the GMC, police surveilled the defendant "for forty-seven minutes before the stop" and saw him engage in behavior that "provided reasonable and articulable suspicion to stop the GMC." Ibid. After the stop, the driver denied consent to search the GMC, and a pat down of the defendant yielded no contraband. Ibid. "[P]olice then called the canine unit to conduct a canine sniff of the GMC to establish probable cause to search the vehicle for drugs." Ibid. (emphasis added).

The Court concluded, "[t]hose combined circumstances, which together gave rise to probable cause, can hardly be characterized as unforeseeable." Ibid. The Court reasoned even though police were "not one hundred percent certain," they "reasonably anticipated and expected they would find drugs in the GMC." Ibid. The Court noted police "invested almost two hours investigating, surveilling, and utilizing five officers." Ibid. Further, police "made the decision

12

to conduct a canine sniff to transform their expectations into probable cause to support a search." Id. at 173.

The Court in Smart also concluded "the circumstances giving rise to probable cause were anything but spontaneous; that is, they did not develop, for example, suddenly or rapidly." Ibid. Instead, the Court found "the circumstances unfolded over almost two hours while investigating long-held information from a CI that defendant had utilized the GMC for drug trafficking." Ibid. Addressing the canine sniff, the Court was persuaded that police tool "was just another step in a multi-step effort to gain access to the vehicle to search for the suspected drugs." Ibid.

By contrast here, as the motion court correctly found, the circumstances giving rise to probable cause were spontaneous because the citizen's tip was "vague," revealing only that there was "suspicious activity or heavy traffic" at Owls Nest Court. We further note, unlike the circumstances in Smart, the citizen's tip did not identify any suspects, vehicles, or specific crimes. Although we recognize Meadows and the female resident were known to police for their drug involvement, the citizen's tip did not tie those individuals or any potential targets to any vehicle, let alone the white Nissan. We therefore agree with the motion court's spontaneity determination.

13

We part company, however, with the court's finding that the circumstances leading to probable cause were foreseeable. As the State persuasively argues, unlike the development of probable cause in <u>Smart</u>, here the "events rapidly unfolded in less than an hour and . . . defendants were not the target of an ongoing investigation." Unlike the circumstances in <u>Smart</u>, where the police received information from the concerned citizen and CI connecting the GMC to drug deals months before the stop, 253 N.J. at 172, in the present matter, law enforcement did not receive any information that Narcisse distributed CDS from the Nissan until Fricks observed the hand-to-hand transaction minutes before the stop. And it was not until police stopped the Nissan that Fricks confirmed Narcisse was the individual who "did the hand-to-hand transaction with Meadows." We agree with the State the circumstances giving rise to probable cause were unforeseeable.

In summary, based on the undisputed motion record, we conclude the circumstances giving rise to probable cause to search the Nissan were both unforeseeable and spontaneous. Accordingly, police were not required to secure the Nissan and its occupants, impound the car, and obtain a search warrant. <u>See</u> <u>State v. Rodriguez</u>, 459 N.J. Super. 13, 23 (App. Div. 2019) (footnote omitted) (reasoning <u>Witt</u> "afford[s] police officers at the scene the discretion to choose

14

between searching the vehicle immediately if they spontaneously have probable cause to do so, or to have the vehicle removed and impounded and seek a search warrant later").  We are therefore satisfied the State established the warrantless search was permitted under the automobile exception.

Reversed and remanded for further proceedings consistent with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division