**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0807-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ANTONIO PABON, a/k/a
MICHAEL K. OROURKE,
ANTONIO H. PABON,
ANTONIO J. PABON,
ANTONIO PAVON, and
ANTONIO PABON MATOS,

    Defendant-Appellant.

_____

        Submitted February 3, 2026 – Decided March 4, 2026

        Before Judges Rose and DeAlmeida.

        On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 21-05-0354.

        Jennifer N. Sellitti, Public Defender, attorney for appellant (Andrew R. Burroughs, Designated Counsel, on the briefs).

Jennifer Davenport, Acting Attorney General, attorney for respondent (Deborah Bartolomey, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

In May 2021, defendant Antonio Pabon was charged in a multiple-count Monmouth County indictment with conspiracy to commit murder and related offenses for his part in a gang-related, drive-by shooting in Asbury Park. Co-defendants Izais Normil and Jaair Butler were charged in the same indictment with various offenses.[1]

Defendant, Normil, and Butler thereafter separately filed motions to suppress evidence seized pursuant to a warrantless search of a vehicle driven by defendant and occupied by Normil and Butler at the time of their arrest. The motion judge consolidated the applications, and after a multiple-day testimonial hearing, issued an order and oral decision denying the motion.

On November 15, 2022, defendant pled guilty to first-degree attempted murder, N.J.S.A. 2C:5-1(a)(1), :11-3(a)(1), and second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1). Following the denial

---

[1] Normil and Butler pled guilty to second-degree possession of a firearm for an unlawful purpose and were sentenced on separate days to eight-year prison terms, with four-year parole disqualifiers pursuant to the Graves Act, N.J.S.A. 2C:43-6(c). As we explain, they are not parties to this appeal.

2

A-0807-23

of his motion to withdraw his guilty plea, defendant was sentenced to an aggregate prison term of nine years, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, pursuant to the terms of the negotiated plea agreement.[2]  A judgment of conviction (JOC) was issued on November 3, 2023.

On appeal, defendant raises the following points for our consideration:

POINT I

AS THE WARRANTLESS SEARCH OF DEFENDANT'S VEHICLE WAS UNCONSTITUTIONAL, ALL EVIDENCE SEIZED THEREIN MUST BE SUPPRESSED.

(1) As the warrantless search of defendant's vehicle was not prompted by unforeseeable and spontaneous circumstances giving rise to probable cause, all evidence seized therein must be suppressed.

---

[2]  Consistent with the plea agreement, the court dismissed the remaining charges of the indictment:  two counts of first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2(a)(1), :11-3(a)(1) (counts one and five); first-degree attempted murder, N.J.S.A. 2C:5-1(a)(1), :11-3(a)(1) (count six); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count seven); second-degree possession of a community gun for an unlawful purpose, N.J.S.A. 2C:39-4(a)(2) (count eight); four counts of second-degree unlawful possession of a firearm, N.J.S.A. 2C:39-5(b)(1) (counts four, nine, ten, and eleven); fourth-degree possession of hollow-nose ammunition, N.J.S.A. 2C:39-3(f)(1) (count twelve); fourth-degree possession of a large-capacity magazine, N.J.S.A. 2C:39-3(j) (count thirteen); two counts of third-degree receiving stolen property, N.J.S.A. 2C:20-7(a) (counts fourteen and fifteen); and three counts of second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1) (counts eighteen, nineteen, and twenty).

A-0807-23

(2) As the search and seizure of the two handguns went beyond the scope of a search permitted for marijuana odor, this evidence must be suppressed.

Unpersuaded, we affirm.

I.

We first address the procedural history before this court. In November 2023, defendant's assigned counsel filed a timely notice of appeal (NOA). In the accompanying case information statement (CIS), defendant claimed his sentence was excessive and the court erroneously denied his plea withdrawal motion. Defendant's appeal therefore was scheduled on a sentencing calendar. See R. 2:9-11.

In April 2024, we granted defendant's motion for leave to file as within time an amended NOA and CIS, and transferred the appeal to the plenary calendar. In her certification in support of the motion, assigned counsel explained, when she filed the initial NOA, she was unaware of the June 10, 2021 order denying defendant's plea withdrawal motion.

On March 21, 2025, defendant filed his merits brief; on June 3, 2025, the State filed its responding brief; and on June 10, 2025, defendant filed his reply brief. Defendant's appeal was scheduled on this court's February 3, 2026 plenary calendar.

A-0807-23

In the meantime, Normil and Butler filed direct appeals challenging their convictions. While defendant's appeal was pending, Normil's and Butler's appeals were consolidated and calendared back-to-back on this court's May 14, 2025 plenary calendar. In their appeals, Normil and Butler challenged the court's June 10, 2021 order and raised the same arguments as those now asserted by defendant.

More particularly, Normil raised one point, contending:

> THE CONTRABAND FOUND IN THE VEHICLE SHOULD BE SUPPRESSED BECAUSE THE POLICE HAD PROBABLE CAUSE TO STOP AND SEARCH THE VEHICLE WELL IN ADVANCE OF DOING SO, YET THEY INEXCUSABLY FAILED TO SEEK A WARRANT.

Butler raised a single point, arguing:

> THE WARRANTLESS SEARCH OF THE AREA UNDER THE GEAR SHIFT OF THE FORD EDGE WAS NOT JUSTIFIED BY THE AUTOMOBILE EXCEPTION TO THE SEARCH WARRANT REQUIREMENT.

We rejected these arguments and affirmed in an unpublished opinion. State v. Normil, No. A-0738-23 (July 25, 2025) (slip op. 2-3). In our opinion, we noted defendant was not a party to those appeals and his appeal was pending, but not yet scheduled. Id. at 3 n.1. The Supreme Court denied certification. 262 N.J. 158 (2025).

5

Against this procedural backdrop, we turn to defendant's appeal, recognizing our obligation to afford defendant "a full and fair review of [the June 10, 2021] order," notwithstanding the similarity of his arguments to those of his co-defendants. See State v. McKinney, 223 N.J. 475, 498 (2015). Having considered defendant's arguments, we discern no basis to depart from the reasons we expressed in rejecting the same contentions raised by Normil and Butler. See State v. K.P.S., 221 N.J. 266, 279 (2015).

II.

For the reader's convenience, we restate the facts set forth at length in Normil:

> During the hearing, the State presented the testimony of four members of the Asbury Park Police Department (APPD): Sergeant Sean DeShader; Detective Terrence McGhee; Officer Michael Paulk; and Detective Jay'von Britt.[*] The State also called Lieutenant Ryan Muller, assigned to the Forensic Bureau of the Monmouth County Prosecutor's Office. [Defendant], Normil, and Butler did not testify, but [defendant] called APPD Detective Lamar Whittaker, the lead investigator on the case. The motion judge also considered body-worn camera footage, surveillance footage, police reports, and photographs of the interior of the vehicle.
>
> Around 9:15 p.m. on December 4, 2019, the APPD received a report of shots fired in the vicinity of Mattison and Borden Avenues. Broken glass and .45 caliber and 9mm shell casings were found at the scene.

6

In his report, Whittaker indicated, on December 4, he reviewed surveillance footage from the crime scene depicting a dark-colored vehicle, resembling a Ford Edge with tinted windows, following a dark-colored Dodge minivan. From the footage, Whittaker traced the path of the Ford Edge from the Asbury Park Deli, where he observed three men enter the vehicle, to the scene of the shooting. In his report, Whittaker stated he ran a license plate reader check and determined the car was registered to [defendant]'s brother.

At the hearing, however, Whittaker acknowledged the chronology set forth in his report was incorrect because he did not review the footage until the following day, December 5. Whittaker testified the video showed "both vehicles were around at the time the shots were fired," but "[he] could not tell which one was shooting, which one was not." In his testimony, Whittaker clarified he ran the license plate reader check after the Ford was stopped.

On December 5, DeShader and Britt were working the 2:00 p.m. to midnight shift. Assigned to APPD's Street Crimes Unit, DeShader and Britt were dressed in plain clothes and worked "proactive patrol" in Asbury Park.

DeShader testified when he arrived for duty, he was briefed about the shooting investigation. DeShader was given "bare information . . . basically two vehicles, a dark-colored Dodge minivan and a dark-colored vehicle that looked like a Ford Edge with tinted windows" fleeing the scene. DeShader was told police "believed that the second vehicle was pursuing the minivan." Britt similarly testified about the briefing.

DeShader explained he saw a black Ford Edge driven by [defendant], and sometimes occupied by

7

Normil and Butler, on previous occasions, including December 4. On that date, around 2:00 p.m., DeShader saw the vehicle near the Asbury Park Deli, driven by [defendant]. When the vehicle was parked, [defendant], Normil, and Butler entered the deli. At the time of the briefing, DeShader was aware [defendant] associated with fellow gang members, Butler and Normil, all of whom DeShader had arrested on prior occasions.

DeShader and Britt both testified, in November 2019, they interviewed a confidential source who disclosed two rival gang members were involved in a physical altercation. Following the December 2, 2019 shooting of a rival gang member, another confidential source informed DeShader and Britt that [defendant] and Normil were involved.

Whittaker advised DeShader and Britt to look out for the Ford Edge, the Dodge minivan, [defendant], Butler, and Normil, while on patrol. With this information, DeShader and Britt patrolled Asbury Park Village in plain clothes "to prevent any type of criminal activity," and to "attempt[] to locate the two vehicles" involved in the shooting. Britt testified "if [they] saw [the Ford Edge] while . . . patrolling and [they] had probable cause to stop it, [they] would [have], but [they] weren't specifically just looking for that car."

While on patrol around 4:20 p.m. on December 5, DeShader and Britt observed a black Ford Edge with tinted windows in the parking lot of a public housing complex, known to police for gang activity. DeShader testified he saw [defendant] in the driver's seat, Butler in the passenger seat, and another individual, who was not arrested, standing outside the Ford Edge. DeShader drove the unmarked police car into the lot and approached the parked vehicle.

A-0807-23

DeShader testified his intention was to "conduct[] a field inquiry and examine[] the exterior of the vehicle to determine whether [the Ford's occupants] were victims, suspects or actors" in the shooting and look for "any damage to the vehicle that would indicate that the vehicle was shot at." Specifically, "all [he] could do at [that] point [was] drive in and conduct a field inquiry . . . and check the car for any type of bullet strikes to make sure that [the occupants] weren't victims of a shooting."

As they approached the Ford, DeShader and Britt observed "a thick cloud of grayish white smoke" inside the vehicle. They also smelled burnt marijuana emanating from the vehicle. DeShader stated he saw Butler "leaning towards the center console" while the officers approached. DeShader testified the odor of burnt marijuana indicated the physical presence of marijuana and "also indicate[d] that marijuana [wa]s being destroyed." DeShader noted [defendant] appeared nervous, laughed with Butler, and had "red and glassy" eyes, indicating he was "under the influence of some type of . . . controlled dangerous substance."

Britt observed Normil in the backseat of the vehicle and called for backup. Britt testified he "didn't want anything to happen" to DeShader or himself and he thought other officers could help "control the scene" given the three men in the vehicle and people watching nearby. After backup officers arrived, Britt and DeShader ordered [defendant], Normil, and Butler out of the vehicle and conducted pat-down searches for weapons, with negative results. Britt searched the passenger compartment of the vehicle as McGhee and Whittaker arrived with other APPD detectives.

9

McGhee assisted Britt with the search of the vehicle. McGhee testified he "detected a strong odor of burnt marijuana coming from the vehicle." While searching, McGhee noticed the gear shift cover in the center console was misaligned and had "tool marks." Based on his training and experience, McGhee believed "somebody had accessed or manipulated" the gear shift cover. He explained the area underneath the gear shift was "not built for storage," but was "a natural void in the vehicle," commonly used by criminals to conceal contraband.

Using his hands, McGhee pulled up the gear shift cover and found a pair of black rubber gloves and a 9mm handgun in the void. Police then arrested [defendant], Normil, and Butler. Continuing his search of the void, McGhee found a .45 caliber handgun. Police also seized cash and cell phones from the vehicle.

Police impounded the Ford and obtained a search warrant for the vehicle. While searching the Ford, police observed an odor of marijuana. The search revealed a bag containing five resealable bags of marijuana under a vent cover connected to the center console, two black ski masks, odor neutralizing sprays, and a razor with off-white residue.

_____

[*] At the time of his testimony, Britt was a member of the Monmouth County Prosecutor's Office.

[Normil, slip op. at 4-9 (additional footnote omitted).]

We restate the judge's decision, which we summarized in Normil:

After considering the parties' lengthy oral and written arguments, the testimony adduced at the

hearing, and the documentary and video evidence, the motion judge issued a comprehensive oral decision spanning more than eighty transcript pages. The judge made detailed factual and credibility findings, noting "[t]he crux of the defense's challenge is the credibility or lack thereof of the State's witnesses." Although the judge found the law enforcement testimony collectively "reveal[ed] a less than perfect body of police work," she found "the testimony of the State's witnesses . . . credible when taken together and considering all other evidence presented."

For example, the motion judge found: "DeShader's testimony was corroborated" and "consistent with his report"; Paulk's account was "inherently believable"; and Muller's testimony was "highly credible." Crediting McGhee's testimony, the judge found any discrepancies in his reports or description of the misaligned gear shift "[we]re not a product of a willful lie or fabrication." The judge further found Britt's credible testimony corroborated McGhee's explanation regarding how easily he opened the gear shift covering. Comparing Whittaker's testimony with his report, the judge found "the discrepancies in the chronology" regarding "the gathering and dissemination of information about the black Ford SUV [were] immaterial to the validity of the warrantless search" in view of "the other credible evidence" in the record. As the judge later explained, that evidence included the officers' sensory observations when they approached the Ford. The judge therefore declined to "give much weight and consideration to . . . Whittaker's testimony."

After summarizing the applicable legal principles, the judge first found, although defendants did not expressly challenge the investigatory detention of the Ford, the detention nonetheless was "valid,

supported by the totality of the circumstances."  The judge found "the sight of smoke and the scent of burnt marijuana, judged under the totality of the circumstances in this matter, gave the officers probable cause for the arrest of the defendants."[*]

Citing our Supreme Court's decisions in State v. Witt, 223 N.J. 409 (2015), and State v. Alston, 88 N.J. 211 (1981), the motion judge concluded the warrantless search was justified under the automobile exception to the warrant requirement.  The judge found, although the arresting officer knew the Ford was involved in a shooting the previous night, there "was at most a two-hour span of time" between DeShader and Britt's briefing and their encounter with [defendant], Normil, and Butler.  The judge determined that time frame "was insufficient to procure a warrant."

Noting the parties "conceded the situation was fluid," the judge further found, even if "DeShader and . . . Britt were aware that the black Ford Edge was . . . potentially connected to th[e] shooting," and had probable cause to procure a warrant, that knowledge "d[id] not undermine the validity of the search prompted by the spontaneous and unforeseen nature of the encounter."  The judge found "the officers did not expect or plan in advance to encounter the vehicle where they did."

The judge found additional circumstances surrounding the stop justified the warrantless search.  The judge cited "the threat to officers' safety" because the individual, who was not arrested, walked away from the vehicle and could have informed other associates of their location – and defendants called out to individuals who had gathered in the parking lot.  The judge also found there was a "possibility that evidence could be removed from the vehicle."  Ultimately, the judge

12

concluded the totality of the circumstances justified the warrantless search of the vehicle.

Turning to the scope of the search, the judge found "the officers had probable cause to believe that contraband could be stored [in the void under the gear shift] given the location within easy access of both [defendant] and Normil, and given the officers' training and experience with natural voids." The judge found the scope of the search was more closely aligned with the search we concluded was permissible in State v. Nunez, 262 N.J. Super. 251 (App. Div. 1993), and distinguished the present facts from the search we determined was impermissible in State v. Murray, 151 N.J. Super. 300 (App. Div. 1977).

_____

[*]   The judge correctly recognized the New Jersey Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act (CREAMMA), N.J.S.A. 24:6I-31 to -56, became effective on February 22, 2021, after the incident date in the present matter. Under CREAMMA, an "odor of cannabis or burnt cannabis" cannot create a "reasonable articulable suspicion of a crime" under most circumstances. N.J.S.A. 2C:35-10c(a). Because that limitation is prospective, it is not applicable in this matter. Before the motion judge and this court, [defendant] ha[s] not argued otherwise.

[Normil, slip op. at 10-13.]

## III.

Our review of a trial court's decision on a motion to suppress evidence is circumscribed. See State v. Fenimore, 261 N.J. 364, 372-73 (2025). After a

13

testimonial hearing, we "defer to the trial court's factual findings because the trial court has the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. S.S., 229 N.J. 360, 374 (2017) (quoting State v. Elders, 192 N.J. 224, 244 (2007)); see also State v. Locurto, 157 N.J. 463, 474 (1999) (recognizing deference is afforded because the court's findings "are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record").

Therefore, we "must defer to the factual findings of the trial court on a motion to suppress so long as its findings are supported by sufficient credible evidence in the record." State v. Erazo, 254 N.J. 277, 297 (2023). Our deference includes the trial court's findings based on video-recorded or documentary evidence. See S.S., 229 N.J. at 374-81 (clarifying the deferential and limited scope of appellate review of factual findings based on video-recorded evidence); see also State v. Tillery, 238 N.J. 293, 314 (2019); State v. McNeil-Thomas, 238 N.J. 256, 271-72 (2019). "A trial court's legal conclusions, 'however, and the consequences that flow from established facts,' are reviewed de novo." State v. Bullock, 253 N.J. 512, 532 (2023) (quoting State v. Hubbard, 222 N.J. 249, 263 (2015)).

14

A.  Validity of the Warrantless Search

On appeal, defendant argues the circumstances leading to the stop of his vehicle were not unforeseeable and spontaneous because police were actively investigating the shooting.  Defendant therefore contends the "pre-planned and deliberate investigatory stop of [his] vehicle" failed to satisfy the automobile exception under Alston and Witt.  Defendant further asserts DeShader's testimony that he detected burnt marijuana as he approached defendant's vehicle was a pretext for the stop, noting police found no evidence of marijuana inside the vehicle.

Well-settled principles guide our review.  The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution protect against "unreasonable searches and seizures" and generally require a warrant issued upon "probable cause."  U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7.  "[A] warrantless search is presumptively invalid" unless the State establishes the search falls into "one of the 'few specifically established and well-delineated exceptions to the warrant requirement.'"  State v. Edmonds, 211 N.J. 117, 130 (2012) (quoting State v. Frankel, 179 N.J. 586, 598 (2004)).

When a defendant moves to suppress evidence seized without a warrant, the State bears the "burden, by a preponderance of the evidence, to establish" an

exception to the warrant requirement applies and that "the warrantless search or seizure of an individual was justified in light of the totality of the circumstances." State v. Bard, 445 N.J. Super. 145, 155-56 (App. Div. 2016) (citing Illinois v. Gates, 462 U.S. 213, 238 (1983)). "[T]he 'touchstone' for evaluating whether police conduct has violated constitutional protections is 'reasonableness.' The reasonableness of police conduct is assessed with regard to circumstances facing the officers, who must make split second decisions in a fluid situation." Id. at 157 (quoting State v. Hathaway, 222 N.J. 453, 476 (2015)).

To conduct a search under the automobile exception to the warrant requirement, the State must satisfy the test set forth in Witt, 223 N.J. at 446-48, "pro[of] that probable cause to believe the vehicle contains contraband or other evidence of unlawful activity arose spontaneously and unforeseeably." State v. Courtney, 478 N.J. Super. 81, 93 (App. Div. 2024) (citing Witt, 223 N.J. at 446-48). The requirements of unforeseeability and spontaneity ensure police "could not sit on probable cause and later conduct a warrantless search, for then the inherent mobility of the vehicle would have no connection with a police officer not procuring a warrant." Witt, 223 N.J. at 432. Thus, "police officers who

possess probable cause well in advance of an automobile search should get a warrant." State v. Smart, 253 N.J. 156, 174 (2023) (citing Witt, 223 N.J. at 431).

"[W]hether the circumstances giving rise to probable cause were unforeseeable and spontaneous is a fact-sensitive inquiry that should be analyzed case by case." Id. at 173. "Probable cause is a well-grounded suspicion that a criminal offense has been or is being committed." State v. Hammer, 346 N.J. Super. 359, 366 (App. Div. 2001); see also State v. Burnett, 42 N.J. 377, 387 (1964). "Whether probable cause existed is to be determined by the objective reasonableness standard." State v. Judge, 275 N.J. Super. 194, 201 (App. Div. 1994); see also State v. Bruzzese, 94 N.J. 210, 218 (1983).

Defendant argues the Court's decision in Smart, issued after the motion judge rendered her decision in this case, supports his argument. In Smart, police stopped a GMC vehicle two months after "a concerned citizen . . . connected a particular residence – and a vehicle like the GMC – with drug deals." Smart, 253 N.J. at 172. The following month, a confidential informant told police the defendant "previously utilized the GMC for drug distribution." Ibid. Prior to stopping the GMC, police surveilled the defendant "for forty-seven minutes before the stop" and saw him engage in behavior that "provided reasonable and articulable suspicion to stop the GMC." Ibid. After the stop, the driver denied

consent to search the GMC, and a pat down of the defendant yielded no contraband. Ibid. "[P]olice then called the canine unit to conduct a canine sniff of the GMC to establish probable cause to search the vehicle for drugs." Ibid.

The Court concluded "[t]hose combined circumstances, which together gave rise to probable cause, can hardly be characterized as unforeseeable." Ibid. The Court reasoned even though police were "not one hundred percent certain," they "reasonably anticipated and expected they would find drugs in the GMC." Ibid. The Court noted police "invested almost two hours investigating, surveilling, and utilizing five officers." Ibid.

Contrary to the arguments advanced by defendant, the facts of the present matter are not analogous to those in Smart. Here, police did not suspect the Ford or its occupants were involved in a narcotics offense prior to the stop. Nor is there any evidence in the motion record suggesting they surveilled the vehicle for evidence of narcotics prior to the encounter. Instead, police encountered the vehicle while on routine patrol. Their observations of the smoke and odor of marijuana were unforeseeable and spontaneous circumstances that developed "suddenly or rapidly" as the officers approached the vehicle. See id. at 173.

Although DeShader and Britt were briefed about the December 4 shooting, the information conveyed to them was bare bones. Unlike the two-

month time frame cited in <u>Smart</u>, the Ford was stopped nineteen hours after the shooting occurred and, at most, two hours after DeShader and Britt were briefed. Unlike the officers in <u>Smart</u>, DeShader and Britt did not impermissibly "sit on" probable cause because the mere suspicion the Ford and its occupants were involved in the shooting did not necessarily rise to the level of probable cause to support a search warrant for the vehicle. <u>See</u> <u>id.</u> at 174 (quoting <u>Witt</u>, 223 N.J. at 431-32). As the motion judge observed, DeShader credibly testified police did not know whether the occupants of the Ford were the aggressors or targets of the shooting. Although the officers suspected defendants were involved in a gang-related shooting, unlike the stop of the GMC in <u>Smart</u>, the investigative stop of the Ford was not "deliberate, orchestrated, and wholly connected with the reason for the subsequent seizure of evidence." <u>See</u> <u>id.</u> at 172.

Instead, as DeShader and Britt approached the Ford, they saw smoke and detected the odor of burnt marijuana. Those observations constituted probable cause to search the vehicle for evidence regarding the possession or distribution of marijuana, independent of the bare bones briefing DeShader and Britt received about the shooting. As the judge recognized, when the stop occurred in December 2019, "the smell of marijuana itself constitute[d] probable cause

19

'that a criminal offense ha[d] been committed and that additional contraband might be present,'" State v. Walker, 213 N.J. 281, 290 (2013) (quoting State v. Nishina, 175 N.J. 502, 516-17 (2004)), and "the detection of that smell satisfie[d] the probable-cause requirement." Id. at 288.

We conclude the motion judge's factual and credibility findings were "supported by sufficient credible evidence in the record." State v. Dunbar, 229 N.J. 521, 538 (2017) (quoting Hubbard, 222 N.J. at 262). We therefore discern no basis to disturb her decision that the warrantless search of the vehicle was justified under the automobile exception to the warrant requirement.

## B. Permissible Scope of the Search

Defendant further argues, even if the automobile exception justified the warrantless search, police exceeded the permissible scope of the search, including probing the area under the gear shift. Citing State v. Cohen, 254 N.J. 308, 327 (2023), defendant argues, "[a] generalized smell of marijuana does not justify the search of every cavity inside a vehicle by the police."

Prior to the enactment of CREAMMA, the permissible scope of a marijuana search was restricted to areas "'strictly tied to and justified by' the circumstances which rendered its initiation permissible." State v. Patino, 83 N.J. 1, 11 (1980) (quoting Terry v. Ohio, 392 U.S. 1, 19 (1968)). In Cohen, our

Supreme Court applied this principle to the proper scope of an automobile search. 254 N.J. at 323-24.

In <u>Cohen</u>, police stopped the defendant's car for a motor vehicle violation. <u>Id.</u> at 314. As they approached the car, police detected the "general smell" of then illegal raw marijuana, although they could not pinpoint which areas within the car were the sources of that odor. <u>Id.</u> at 325. Police also observed what appeared to be marijuana in the driver's beard. <u>Id.</u> at 314. After finding no drugs or contraband in the passenger compartment, the officers searched the car's trunk and under the engine hood, and found two guns under the hood. <u>Id.</u> at 315. The Court invalidated the search that went beyond the passenger area of the car because the general smell of marijuana was inadequate, in and of itself, to justify a further warrantless intrusion outside the interior of the car. <u>Id.</u> at 327.

The Court provided guidance for the resolution of other pre-CREAMMA cases. As a general rule, the Court held searches extending beyond the passenger compartment of a car must be justified by "facts indicating something more than simply detecting the smell of marijuana from the interior of the car." <u>Id.</u> at 324. Pertinent to this appeal, the Court explained:

> <u>This holding in no way suggests that areas within the interior of the car would require separate probable cause findings in order to conduct a warrantless search.</u> We are not dividing up the interior of vehicles such that

an officer would need to establish different or additional probable cause to search the front seat as opposed to the back seat, for example. Pursuant to the automobile exception, if an officer has probable cause to search the interior of the vehicle, that probable cause encompasses the entirety of the interior.

[Id. at 327 (emphasis added).]

Expanding on the Cohen decision, this court examined the permissible boundaries of searching a vehicle's interior under the automobile exception. State v. Wilson, 478 N.J. Super. 564 (App. Div.), leave to appeal denied, 258 N.J. 420, 258 N.J. 432, and 258 N.J. 434 (2024). In Wilson, the defendant successfully moved to suppress three weapons found in a locked glove box during a warrantless search of a vehicle pursuant to the automobile exception. Id. at 571. This court reversed, holding: (1) probable cause arose "spontaneously and unforeseeably" based on the smell of marijuana; (2) police conducted the search in a manner "reasonable in its physical scope," as the weapons were found in the glove box, which was "within the passenger compartment in a container that could conceal the object of the search"; and (3) police used a reasonable intensity in its search because they "did not break open the glove box but instead used the ignition key to unlock it without causing any damage." Id. at 572-73.

Quoting <u>Cohen</u>, we held "a search that is reasonable at its inception may become unlawful 'by virtue of its <u>intolerable intensity</u> and scope.'" <u>Id.</u> at 590 (quoting <u>Cohen</u>, 254 N.J. at 320). We interpreted this search and seizure principle to not only limit <u>where</u> police can search within a vehicle but also the methods and tools they can use, including the amount of force and property damage allowed. <u>Ibid.</u>

Defendant has not cited and our research has not revealed any New Jersey authority expressly addressing whether police may search the area under a car's gear shift pursuant to the automobile exception to the warrant requirement. Notably, in <u>Wilson</u>, we "ha[d] no occasion . . . to consider what level of intensity or damage would exceed the permissible boundaries of the automobile exception," because by opening the glove box with a key, "there was <u>no</u> insult to the structural integrity of the vehicle and <u>no</u> damage caused to the glove box." <u>Id.</u> at 591-92.

As we emphasized in <u>Wilson</u>, "New Jersey['s] automobile exception . . . is designed to permit unplanned, <u>expeditious</u> roadside searches." <u>Id.</u> at 591. We also noted exigency concerns underlying the automobile exception "counsel against protracted roadside searches that entail, for example, figuring out how to safely access trap doors and hidden compartments, or otherwise interfering

23

with the structure of a vehicle." Id. at 591 n.9. "This warrant exception, as circumscribed under Article I, Paragraph 7, does not contemplate disassembling a vehicle or using the jaws of life to find the objects of the search." Id. at 591. Compare Murray, 151 N.J. Super. at 308 (holding law enforcement's removal of the vehicle's front seat and prying open the locked box discovered underneath "interfere[ed] with the structural integrity of the vehicle" and was "fatally excessive in scope"), with Nunez, 262 N.J. Super. at 254 (affirming the denial of a suppression motion where the trooper, without opening a car's compartment, retrieved contraband).

Unlike the circumstances presented in Murray, McGhee did not use tools to access the void. Nor did he use excessive force. Instead, as the judge found, McGhee "access[ed] the compartment with minimal effort." Therefore, under Murray, McGhee's access did not "interfer[e] with the structural integrity of the vehicle." See Murray, 151 N.J. Super. at 307. Because the gear shift cover was, as the judge described it, "loose," "misaligned," or not positioned "flush with the rest of the console," there was "indicia of non-factory manipulation and use." Accordingly, the structural integrity of the vehicle was tampered with before McGhee searched the interior of the vehicle.

We therefore conclude the motion judge correctly determined the officers' search did not exceed the permissible scope of the automobile exception and, as such, the exception authorized police to remove the gear shift cover and search the void under the circumstances presented in this case. Unlike the search conducted in Murray, the officer's warrantless search here did not "transcend[] all bounds of reasonableness." See ibid.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0807-23